## MARYLAND CASUALTY CO. ET AL. *v.*
## CUSHING ET AL.

No. 11. Argued April 27–28, 1953.—Reargued November 10, 12, 1953.—Decided April 12, 1954.

*Eberhard P. Deutsch* argued the cause for petitioners. With him on the brief was *René H. Himel, Jr.*

*James J. Morrison* argued the cause and filed a brief for respondents.

MR. JUSTICE FRANKFURTER announced the judgment of the Court and an opinion in which MR. JUSTICE REED, MR. JUSTICE JACKSON and MR. JUSTICE BURTON join.

On the evening of May 19, 1950, the towboat *Jane Smith* in attempting to pass under a bridge over the Atchafalaya River in Louisiana collided with a concrete pier and capsized. The owner and charterer of the *Jane Smith* filed consolidated petitions in admiralty in the United States District Court in Louisiana to limit their liability under the provisions of 46 U. S. C. §§ 183 and 186.[1] The owner and charterer having complied with the procedural requirements of the Limitation Act, the District Court issued an injunction prohibiting suit against them elsewhere than in the limitation proceeding.

Subsequently, in the same District Court, the plaintiffs below, as representatives of five seamen who had been drowned, brought this consolidated action against the owner of the bridge and the liability underwriters of the owner and charterer of the ship.[2] Jurisdiction was based on diversity of citizenship and the Jones Act, 46 U. S. C. § 688. For their right to proceed against the insurance companies, the plaintiffs relied on § 655 of the Louisiana

---

[1] 46 U. S. C. § 183: "(a) The liability of the owner of any vessel, whether American or foreign . . . for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not, except in the cases provided for in subsection (b) of this section, exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."

§ 186: "The charterer of any vessel, in case he shall man, victual, and navigate such vessel at his own expense, or by his own procurement, shall be deemed the owner of such vessel within the meaning of the provisions of this chapter relating to the limitation of the liability of the owners of vessels; . . . ."

[2] Prior to instituting this action, all five plaintiffs had filed in the limitation proceeding pleadings challenging the shipowner's and charterer's right to limit their liability and asserting claims for damages.

Insurance Code which authorizes direct suit "against the insurer within the terms and limits of the policy."

The two policies sued upon are (1) a workmen's compensation and employer's liability policy, in the amount of $10,000, issued by the Maryland Casualty Co. in which the charterer alone is named as the insured and which contains a special endorsement making its terms applicable to maritime employment; and (2) a "protection and indemnity" policy in the amount of $170,000 issued by the Home Insurance Company of New York in which both the owner and the charterer are named. Both policies by their terms preclude payment to anyone until the insured shall have been held liable to pay damages.[3]

The District Court granted a motion for summary judgment dismissing the consolidated suit against the insurers on the grounds that the Louisiana statute was, by its own terms, inapplicable to policies of marine insurance, and that in any case application of the statute here would "not only work material prejudice to the characteristic features of the general maritime law but would

---

[3] The Protection and Indemnity policy issued by the Home Insurance Company contained the following clauses. "It is agreed that if the Assured, as shipowners, shall have become liable to pay, and shall have in fact paid, any sum or sums in respect of any responsibility, claim, demand, damages and/or expenses, or shall become liable for and shall pay any other loss arising from or occasioned by any of the following matters or things . . . ." There follows the types of injury and loss for which the Company is liable. A subsequent proviso reads "Liability hereunder shall in no event exceed that which would be imposed on the Assured by law in the absence of Contract."

Condition G of the policy issued by Maryland Casualty provides: "No action shall lie against the Company to recover upon any claim or for any loss under Paragraph I (b) foregoing unless brought after the amount of such claim or loss shall have been fixed and rendered certain either by final judgment against this Employer after trial of the issue or by agreement between the parties with the written consent of the Company, nor in any event unless brought within two years thereafter."

also contravene the essential purpose expressed by an Act of Congress in a field already covered by that Act. Title 46, § 183, U. S. C. A." 99 F. Supp. 681, 684.

The Court of Appeals, relying solely on diversity jurisdiction, reversed, holding that as a matter of local law the District Court had read the Louisiana statute too restrictively, a question not open here, and that the statute was nothing more than a permissible regulation of insurance authorized by the McCarran Act, 15 U. S. C. § 1012, and not in "conflict with any feature of substantive admiralty law, nor with any remedy peculiar to admiralty jurisdiction." 198 F. 2d 536, 539. Deeming this ruling important to the proper enforcement of the Limitation Act, we granted certiorari. 345 U. S. 902.

The only question presented in the petition for certiorari is whether the application of the Louisiana statute in this case would violate "the Jones Act, the Limited Liability Act and the constitutional grant to the federal government of exclusive jurisdiction in maritime matters." We agree with the Court of Appeals that since diversity supports federal jurisdiction, the Jones Act need not be drawn upon for jurisdiction. Nor need we be detained by petitioners' contention that as applied to claims against petitioners as underwriters of the charterer who employed the decedents, the State statute here conflicts with the Jones Act in that it would provide an alternative remedy where Congress has prescribed the means of recovery. Since that Act itself makes its remedy available to a seaman "at his election," we perceive no conflict between the Jones Act and the Louisiana direct action statute.

Respondents, on the other hand, seek to derive support for reliance on the Louisiana statute from the McCarran Act which provides "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to

the business of insurance . . . ."  15 U. S. C. § 1012.  Suffice it to say that even the most cursory reading of the legislative history of this enactment makes it clear that its exclusive purpose was to counteract any adverse effect that this Court's decision in *United States* v. *South-Eastern Underwriters Association,* 322 U. S. 533, might be found to have on State regulation of insurance.  The House Report on the Bill as enacted is decisive:

> "It is not the intention of Congress in the enactment of this legislation to clothe the States with any power to regulate or tax the business of insurance beyond that which they had been held to possess prior to the decision of the United States Supreme Court in the *Southeastern Underwriters Association case.*"  H. R. Rep. No. 143, 79th Cong., 1st Sess. 3.

The question whether application of the direct action statute conflicts with federal maritime law is not touched by the *South-Eastern Underwriters* case.  In the face of this unequivocal expression of congressional meaning, the statute cannot be read as doing something that Congress has told us it was not intended to do.  The McCarran Act is not relevant here.

This brings us to the governing issue: does the Louisiana statute enter an area of maritime jurisdiction withdrawn from the States?  Since Congress has provided a comprehensive legislative system for adjudicating maritime claims, we pass directly to considering whether the operation of the Louisiana statute conflicts with that system, putting to one side the question whether it encroaches upon the general body of nonstatutory maritime law.  Cf. *Red Cross Line* v. *Atlantic Fruit Co.,* 264 U. S. 109; *Just* v. *Chambers,* 312 U. S. 383.

Legislation limiting shipowners' liability was first enacted in 1851 to provide assistance to American shipowners and thereby place them in a favorable position

in the competition for world trade. 9 Stat. 635. It provides that in event of a collision or other maritime mishap, occurring "without the privity or knowledge" of the owner (including therein a charterer), liability will be limited to the value of the ship and freight pending.[4] The Act also permits the shipowner by instituting limitation proceedings to have all claims against him brought into concourse in an admiralty tribunal.

The legislation was designed to induce the heavy financial commitments the shipping industry requires by mitigating the threat of a multitude of suits and the hazards of vast, unlimited liability as a result of a maritime disaster. This Court has been faithful to this ultimate purpose and has read the statute's words "in a broad and popular sense in order not to defeat the manifest intent." *Flink* v. *Paladini*, 279 U. S. 59, 63. Particularly in view of the fact that Congress subjected the whole limitation scheme to scrutiny in 1935 and 1936 as a result of its application to personal injury and death claims resulting from the sinking of the *Morro Castle,* and did not alter those provisions of the legislation involved here, we must read the statute in the light of its expressed purposes. It is not for us to sit in judgment on the policy of Congress in having all claims disposed of in one proceeding or in apportioning maritime losses.

---

[4] This Court has interpreted this as meaning the value *after* the accident. *Norwich Co.* v. *Wright*, 13 Wall. 104.

After the *Morro Castle* disaster, in which 135 lives were lost and the owners sought to limit their liability to $20,000, Congress changed the statute to provide that if the value of the vessel and freight pending is not enough to cover all claims, that portion of the total recovery applicable to personal injury or death claims shall be at least $60 per ton. 49 Stat. 960; 49 Stat. 1479. 46 U. S. C. § 183 (b)–(e). This provision is applicable, however, only to "seagoing vessels," defined as excluding towboats which is the type of vessel involved here. 46 U. S. C. § 183 (f).

The direct action statute clashes with the federal system for marshalling all claims arising from certain maritime causes of action. See the detailed provisions in Admiralty Rules 51–54, 334 U. S. 864. The heart of this system is a *concursus* of all claims to ensure the prompt and economical disposition of controversies in which there are often a multitude of claimants. The benefits a *concursus* bestows on the shipping industry were thus described in the hearings on the 1936 amendments to the Limitation Act:

"Under the limitation statutes, as we have had them since 1851, they had two different purposes to serve; one was to limit the liability of the owner and the other was to draw into one court, in the case of a large accident, all of the claims, in order that they might be heard by one judge on one state of facts, in one trial, and intelligently disposed of. Suppose a big sea comes aboard a passenger liner and 15 or 20 people on that deck are washed up against the stanchions or something else, and the claim is that the ship ought to have slowed down, ought to have known by radio. Those passengers may live anywhere from Maine to Texas, and if you have 20 separate laws in 20 different jurisdictions, you just cannot handle an accident of that kind in any possibly intelligent way. One court will say the line was not negligent; another court will say it was negligent; a third court will say you are entitled to $1,500; the next one may say you are entitled to $45,000; and nobody knows where he is.

"So one of the most useful purposes of the limitation statute was that in a case like that you could file a petition bringing into one court all of the claimants and have one trial. Otherwise you would have to keep the crew off of the ship traveling around

the country for 2 or 3 years." Statement by Mr. Charles S. Haight, representing the French Line, Hearings before House Committee on Merchant Marine and Fisheries on H. R. 9969, Part 4, 74th Cong., 2d Sess. 69–70.

And commenting on the limitation of liability sections of the Admiralty Rules of this Court, Mr. Justice Bradley thus described their purpose:

"In promulgating the rules referred to, this court expressed its deliberate judgment as to the proper mode of proceeding on the part of shipowners for the purpose of having their rights under the act declared and settled by the definitive decree of a competent court, which should be binding on all parties interested, and protect the ship owners from being harassed by litigation in other tribunals. . . . The questions to be settled by the statutory proceedings being, first, whether the ship or its owners are liable . . . and secondly, if liable, whether the owners are entitled to a limitation of liability, must necessarily be decided by the district court having jurisdiction of the case; and, to render its decision conclusive, it must have entire control of the subject to the exclusion of other courts and jurisdictions. If another court may investigate the same questions at the same time, it may come to a conclusion contrary to that of the district court; and if it does (as happened in this case), the proceedings in the district court will be thwarted and rendered ineffective to secure to the ship owners the benefit of the statute." *Providence & New York S. S. Co.* v. *Hill Co.*, 109 U. S. 578, 594–595.

Direct actions against the liability underwriter of the shipowner or charterer would detract from the benefit of a *concursus* and undermine the operation of the congres-

sional scheme for the "complete and just disposition of a many cornered controversy." *Hartford Accident & Indemnity Co.* v. *So. Pacific Co.*, 273 U. S. 207, 216. The ship's company would be subject to call as witnesses in more than one proceeding, perhaps in diverse forums. Conflicting judgments might result. Ultimate recoveries might vary from the proportions contemplated by the statute. Moreover, it is important to bear in mind that the *concursus* is not solely for the benefit of the shipowner. The elaborate notice provisions of the Admiralty Rules are designed to protect injured claimants. They ensure that all claimants, not just a favored few, will come in on an equal footing to obtain a pro rata share of their damages. To permit direct actions to drain away part or all of the insurance proceeds prejudices the rights of those victims who rely, and have every reason to rely, on the limitation proceeding to present their claims.[5]

Furthermore, insurers, unable to rely on the limitation of liability of their insured and denied the benefits of the *concursus,* would in all likelihood reflect the increased costs in their premiums, thus passing on to the very class sought to be benefited by the federal legislation the short-circuiting effects of the State statute.[6]

In addition to encroachment upon the federal statutory system for bringing all claims into concourse, the direct action statute is in conflict with the congressional policy

---

[5] For example, in this case the representatives of a sixth victim may be relying on the limitation action to prove "privity or knowledge" and thus seek a judgment substantially in excess of the ship's value. They will be penalized for relying on the federal legislation and the Rules if the direct actions drain away the insurance proceeds and the shipowner and charterer are unable to meet additional judgments.

[6] That the cost and indeed the availability of insurance depends on limited liability was brought to the attention of Congress in the hearings on the 1936 amendments to the Limitation Act. See Hearings before House Committee on Merchant Marine and Fisheries on H. R. 9969, Part 4, 74th Cong., 2d Sess. 66–67, 129.

of limited liability. The complaints in those two of the five consolidated suits which are by agreement part of the record here total $600,000 in alleged damages. Thus, we are certainly on notice that the total damages of the respondents may exceed the $180,000 sum which the policies would cover. If the present actions were to result in judgments equaling the face amount of the policies, the insurers would be exonerated of any further obligation to indemnify the owner and charterer under the policies. The shipowner and charterer would then have to face whatever claims may be presented stripped of their insurance protection. How this may come about is easily seen if we assume that the salvaged ship will finally be valued at $25,000—the amount for which we are advised a stipulation has been filed in the limitation proceeding. If the five claimants were to succeed in obtaining judgments of $180,000 without exhausting all claims, there would be no bar to an additional $25,000 recovery from the shipowner and the charterer in the limitation proceeding by other claimants, or perhaps even by some of the respondents here. Yet in the absence of the direct action statute, the liability policies would be more than sufficient to cover any judgment that might be rendered in the limitation action. Under these circumstances, the extent to which the insured lose the benefits which Congress intended them to have is measured by the protective value of their insurance.[7] Without having bought any policies

---

[7] This is equally true whatever the vessel is valued at. Of course, we do not know now that the vessel will finally be valued at $25,000. The final valuation may be more or less. Certainly, on the record before us we cannot assume that the ship is valueless, and it may be that shipowner and charterer will need the full $180,000 face value of the policy to indemnify them for a judgment in the limitation action. The very reason that the present suit should not be allowed to proceed is that it is for the limitation proceeding to determine value.

they could only have been held for $25,000. If they buy the policies, and the Louisiana statute is applied to permit these suits, their liability is still $25,000.

Thus, to permit direct actions under the State statute would require that shipowners become self-insurers for liability risks in order to be sure of getting the full protection of the limitation legislation. In view of the fact that "substantially all maritime risks are insured," *Keen* v. *Overseas Tankship Corp.*, 194 F. 2d 515, 518 (L. Hand, J.), this sort of qualification would be completely inconsistent with the Limitation Act.

In 1886 the Court was called upon to decide whether the proceeds from a hull insurance policy are part of an owner's "interest" in a ship and as such must be turned into the limitation proceeding. In *The City of Norwich*, 118 U. S. 468, the Court held that insurance proceeds need not be turned in. In part, the decision was based on a narrow interpretation of "interest." But Mr. Justice Bradley, who had a commanding role in applying the Limitation Act, reviewed the history and policy of limited liability, and the language of that opinion is an illuminating guide here:

> "Now, to construe the law in such a manner as to prevent the merchant from contracting with an insurance company for indemnity against the loss of his investment is contrary to the spirit of commercial jurisprudence. Why should he not be allowed to purchase such an indemnity? Is it against public policy? That cannot be, for public policy would equally condemn all insurance by which a man provides indemnity for himself against the risks of fire, losses at sea, and other casualties. To hold that this cannot be done tends to discourage those who might otherwise be willing to invest their money in the shipping business." 118 U. S., at 504–505.

And the Court, in *The City of Norwich,* foreshadowed the consequences of permitting direct actions against liability insurers of shipowners: "No form of agreement could be framed by which [shipowners] could protect themselves. This is a result entirely foreign to the spirit of our legislation." 118 U. S., at 505.

Of course, wholly apart from the respect to be accorded State legislation, this Court should be slow to find that even where Congress has exercised its legislative power it has not left room for State action. *Kelly* v. *Washington,* 302 U. S. 1. But where, as in this case, the evident design of Congress can only be carried out by barring State action, it must be barred.

It is true that the record before us does not establish with certainty that the present suits would in fact operate to leave the shipowner and charterer to face liability in the limitation action without indemnification. Judgments in the present actions against the insurers might satisfy all claims or leave enough insurance money to indemnify the shipowner and charterer for liability in the limitation action. The salvaged vessel may finally be valued as worthless, exonerating the shipowner and charterer from any liability in the limitation action. Or the right of the shipowner and charterer to limit their liability might be successfully challenged on the grounds that the mishap did not happen without their "privity or knowledge." [8]

These elements of uncertainty provide a temptation to let the present actions proceed. Further support for this view may reasonably be found in the fact that it is the insurers rather than the shipowner and charterer who are

---

[8] The allegation of "privity" and "knowledge" is not an assumption on the basis of which this case could be disposed of. The shipowner's and charterer's right to limitation must be determined, as provided by the Act and Rules of this Court, in the limitation proceeding itself, not in the present suits to which they are not parties.

here seeking to rely on the Limitation Act as a defense. But the crucial fact which requires that the conflict between State and federal law be faced now is that the present actions are brought completely independently of the limitation proceeding. If the Court keeps hands off the direct actions, the draining away of the insurance proceeds cannot be challenged at any time by anyone.

This is not a case where some future action remains to be taken by one of the parties to a suit before the critical issue is presented to the Court as clearly as may be. See *United Public Workers* v. *Mitchell,* 330 U. S. 75. Nor is this a case where we can postpone our review until a State court gives meaning to a challenged State statute. *Albertson* v. *Millard,* 345 U. S. 242. In the suits before us, the Court is at the point of no return. Once the respondents have recovered from the insurers the face amount of the insurance policies in the present actions, and they or other claimants are going after the shipowner and charterer in the limitation action, it will be too late to rely on the Limitation Act to preserve the insurance proceeds.

Thus, it is clear that if the present direct actions are permitted, they involve substantial hazard to rights granted by an Act of Congress, leaving no way for such impairment to be challenged. Respect for the Act precludes allowance of litigation, based on a State statute, which carries the potentiality of irreparable infringement upon federal law. The point of inadmissible conflict between State and federal legislation is reached as soon as suit is brought against the liability underwriters to get at proceeds of the policies. And if the federal legislation bars such a suit, it would be anomalous to say that the underwriters may not here contest the direct actions.

Of course, liability underwriters are not entitled to "limitation of liability" as that phrase is used as a term

of art in admiralty. To state the issue in these terms is to misconceive it. The question is whether the Court is to disregard the effect of a direct action on the federal proceedings. The Louisiana statute, as applied to authorize suits against the insurers of shipowners and charterers who have instituted limitation proceedings, is a disturbing intrusion by a State on the harmony and uniformity of one aspect of maritime law. It is accentuated by the fact that the federal law involved is not a more or less ill-defined area of maritime common law, incursion upon which need not be here considered, but an Act of Congress, well-defined and consciously designed, with detailed rules for its execution established by this Court.

> "If the courts having the execution of [the Limitation Act] administer it in a spirit of fairness, with the view of giving to ship owners the full benefit of the immunities intended to be secured by it, the encouragement it will afford to commercial operations (as before stated) will be of the last importance: but if it is administered with a tight and grudging hand, construing every clause most unfavorably against the ship owner, and allowing as little as possible to operate in his favor, the law will hardly be worth the trouble of its enactment. Its value and efficiency will also be greatly diminished, if not entirely destroyed, by allowing its administration to be hampered and interfered with by various and conflicting jurisdictions." *Providence & New York S. S. Co.* v. *Hill Co.,* 109 U. S. 578, 588–589.

Accordingly, MR. JUSTICE REED, MR. JUSTICE JACKSON, MR. JUSTICE BURTON and I would reverse the judgment of the Court of Appeals and reinstate that of the District Court dismissing the complaints. For the reasons stated in his opinion, MR. JUSTICE CLARK agrees that the direct

action suits should not be permitted to impair the ship-owner's and charterer's right to indemnification, but he would allow the District Court to adjudicate the liability of the petitioners to the respondents after the limitation proceeding has run its course.

In order to break the deadlock resulting from the differences of opinion within the Court and to enable a majority to dispose of this litigation, we vacate the judgment of the Court of Appeals and order the case to be remanded to the District Court to be continued until after the completion of the limitation proceeding.

*It is so ordered.*

MR. JUSTICE CLARK, concurring.

I see no necessity for invalidating Louisiana's law by dismissing these direct actions. In administering the Limited Liability Act the Court can easily avoid a clear conflict between it and the direct action statute.

The Limited Liability Act admittedly was not designed for the benefit of insurance companies; nor does it deal with their liability. The purpose of the Congress in passing the Act in 1851 was to encourage investment in American ships by placing a limitation upon the personal liability of the shipowner in the event of an accident where there is no "privity or knowledge." Thereafter this Court in *The City of Norwich,* 118 U. S. 468 (1886), recognized the right of a shipowner to buy insurance coverage for damage to his hull in order to protect against the loss of his investment. The proceeds of such "hull insurance" were held, for purposes of a limitation proceeding, not a part of "the interest" of the owner in the vessel. The basis of the decision was that Congress intended the Act to protect the investment of shipowners, and if the latter were prevented from indemnify-

ing themselves from loss of their investment in the ship it would be contrary to the purpose of Congress as well as to the spirit of commercial jurisprudence. Here, the damage claims which may be sustained in the limitation proceeding will be chargeable against the *Jane Smith* and the owner may lose the damaged hull or its value unless he can recoup through the insurance which is involved in these direct actions and which he purchased for his protection. If the insurance proceeds are exhausted in the direct actions, the owner's recoupment will be impossible. Though the holding in *The City of Norwich* does not control, I think that the reasoning of that case is pertinent; in other words, the owner of the ship has the same right to protect his investment in the ship by insurance against damage claims arising in its operation and which are chargeable to it [1] as he has to protect his investment from damage to the ship itself. Unless the owner is afforded an opportunity to provide for such protection, the purpose of Congress to encourage investment in American ships will be just as much thwarted as it would have been had the owner's right to buy insurance protection in *The City of Norwich* not been recognized.

To say that this view benefits the shipowner "at the expense of the families of the deceased seamen" is to ignore the realities of the case. Had the owner not purchased liability insurance the claimants could not, under any condition, recover more than the value of the damaged hull if there is no "privity or knowledge." The owner's liability insurance is the sole source of the claimants' hope for a recovery beyond the value of the

---

[1] The business practice of purchasing marine protection and indemnity insurance, the type primarily involved here, to protect the shipowner against this contingency has long been recognized. See testimony of Ira A. Campbell for American Steamship Owners' Association, at Hearings before House Committee on Merchant Marine and Fisheries on H. R. 4550, 74th Cong., 1st Sess. 91, 125, 131.

damaged hull. The owner's motive in purchasing insurance certainly was not to protect his seamen or the public, but to protect himself against damage claims. And in so doing he has aided the widows and orphans of the deceased seamen by creating the possibility of an additional recovery against the insurance companies. Nor can the owner "profit" from the accident. The amount he may recover from the insurers under the liability policies could never exceed the amount he is obligated to pay to the claimants in the limitation proceedings. He "profits" only in the sense that he is permitted to receive the protection for which he paid.

This is not to say that the insurance companies in a direct action are liable to damage claimants. That would be a question of Louisiana law. Our only interest is to make certain that such actions do not interfere with the Federal Limitation proceeding. To do this we need only require that the limitation proceeding be concluded first and the owner's liability settled under it. The petitioners could then discharge this liability, to the extent their policies covered it, by paying into the limitation proceeding the proper sum.[2] The door would then be left open for prosecution of the direct actions against the insurance companies on the remaining coverage of the policies. Thus, whatever the insurers' liability may be under Louisiana law in the subsequent direct actions, the owner's purse cannot be touched.

MR. JUSTICE FRANKFURTER's opinion states that the cases might be held for the limitation proceeding were it not that Congress intended that proceeding to be, in addition to a concursus of all claims against the owner

---

[2] Of course, if the ship is a total loss, and assuming no privity or knowledge, the owner's liability would be nothing under the federal Act. All the insurance would then be available to claimants in the direct actions, if liability is present under Louisiana law.

and charterer, the exclusive forum for litigating all liability resulting from the accident. This is certainly not an unreasonable position. To be sure, some of the arguments for a concursus of claims against the owner or charterer would be applicable to claims against the insurer. But I do not think the arguments for such a holding are so persuasive, and the case for an opposite conclusion so feeble, that we should proceed at this juncture to invalidate a state law. It is also reasonable to read the Limited Liability Act as aimed at protecting only owners and charterers. The statute does not speak of suits against insurers. And when the Admiralty Rules were adopted we were concerned solely with the problems of the owner and charterer. For example, the limitation court is empowered to enjoin suits in other courts arising out of the accident only if the suits are against the owner, charterer or vessel; no mention was made of enjoining suits against any other party, *e. g.,* insurance companies. See Rule 51. In sum, we must read between the lines in interpreting the Act regardless of how we hold. When the issue is so close, I would resolve it in favor of upholding rather than invalidating a state statute. We are not here confronted with a picture of lawsuits in twenty-odd states under twenty different state laws; if this be a valid argument against upholding the statute in another situation, it has no application in this case. The towboat *Jane Smith,* owned by a Louisiana resident, plied only Louisiana waters of the Atchafalaya River; the accident which befell the vessel occurred in Louisiana; all the parties save one resided in the state and both the limitation proceeding and the damage suits are pending in the same court before the same judge. Moreover, the damage claimants, perhaps secondary beneficiaries of the Limited Liability Act, are also the beneficiaries of a holding that the Limited Liability Act does

not foreclose the possibility of direct actions by them subsequent to the limitation proceeding.

For these reasons, I would direct the District Court to first conclude the limitation proceeding, after which the liability, if any, of the petitioners on their policies in the direct actions could be determined.

MR. JUSTICE BLACK, with whom THE CHIEF JUSTICE, MR. JUSTICE DOUGLAS and MR. JUSTICE MINTON concur, dissenting.

The towboat *Jane Smith* hit a railroad bridge and sank in Louisiana waters of the Atchafalaya River. Five crew members were drowned. Petitioners, Maryland Casualty Company and Home Insurance Company, had previously sold insurance policies to the boat's owner and its charterer agreeing to repay them for any money they had to pay on account of injury or death caused by the boat. These policies were issued and delivered in Louisiana. A Louisiana statute authorizes injured persons or their heirs to sue insurance companies directly on such policies. Under this law the widows of the drowned crewmen brought these diversity actions in federal court against petitioners. A majority of the Court hold that permitting these suits to go forward to judgments against the insurance companies prior to completion of limitation of liability proceedings under an 1851 Act of Congress would bring this state statute into conflict with that Act. But the 1851 Act was passed to help shipowners by limiting the damages they must pay on account of wrongs inflicted by their agents. I see no possible reason for making insurance companies the beneficiaries of this shipowners' relief Act. Neither can I understand why this Court should feel called on to relieve shipowners from even the light financial burden that the 1851 Act left them to bear. Nor do I think the Louisiana Act is subject to any of the

constitutional objections the insurance companies urge against it. I agree with the Court of Appeals for the Fifth Circuit that the insurance companies' contentions "over-inflate a relatively simple proposition with apparent, but unreal, technical problems." 198 F. 2d 536, 539. For that reason without more I would affirm this judgment. But because of the confused state in which this case goes back to the District Court I think it desirable that all questions be discussed. I shall first take up the constitutional objections.

## I.

(a) The insurance companies argue that the Louisiana law impairs the obligation of "maritime contracts." The implication is that maritime contracts have more constitutional protection than other kinds of contracts. But Art. I, § 10 of the United States Constitution, which forbids states to impair the obligations of contracts, draws no such distinction. And while in general this provision protects valid contracts from impairment by subsequent legislation of states, it does not forbid states to pass laws regulating contracts thereafter to be made. *Munday* v. *Wisconsin Trust Co.*, 252 U. S. 499, 503. Cf. *Home Building & Loan Assn.* v. *Blaisdell,* 290 U. S. 398. Hence the Louisiana law, passed before these insurance policies were issued, does not violate the impairment of contract clause and, unless invalid for some other reason, the state's "direct action" statute became a part of the contract when it was made just as though written into each policy by the companies. *New York Life Ins. Co.* v. *Cravens,* 178 U. S. 389, 395–400. Cf. *Farmers and Merchants Bank* v. *Federal Reserve Bank,* 262 U. S. 649, 660.

(b) Article III, § 2 of the Constitution provides that "The judicial Power shall extend . . . to all Cases of admiralty and maritime Jurisdiction . . . ." It is con-

tended that this provision not only gives the Federal Government supreme power over maritime affairs but that it also denies any power in states to legislate in this field. This complete denial of state power is said to have been established by *Southern Pacific Co.* v. *Jensen,* 244 U. S. 205, and *Knickerbocker Ice Co.* v. *Stewart,* 253 U. S. 149. The opinions in those cases did lend some support to a constitutional doctrine that the Admiralty Clause requires rigid national uniformity in maritime legislation. But this Court rejected that doctrine in *Red Cross Line* v. *Atlantic Fruit Co.,* 264 U. S. 109. Mr. Justice Brandeis speaking for the Court in that case made it absolutely clear that the Admiralty Clause does not deprive states of power to make different regulations in regard to maritime affairs unless a state attempts to modify or displace essential features of the substantive maritime law or to modify the remedial law of admiralty courts. See also *Standard Dredging Corp.* v. *Murphy,* 319 U. S. 306. These cases but reaffirmed a power that states have always exercised. When the Constitution was adopted the Government found state regulatory systems governing local maritime affairs throughout the country. *Gibbons* v. *Ogden,* 9 Wheat. 1, 207. Congress has never attempted to supplant all local maritime regulations but has left many in effect as useful aids in carrying out national maritime policies. See *Cooley* v. *Board of Wardens,* 12 How. 299; *The Hamilton,* 207 U. S. 398; *Kelly* v. *Washington,* 302 U. S. 1, 14–16. For example, states can even create liens on vessels which may be enforced either in state courts or in courts of admiralty, despite the lack of uniformity brought about by "intricate and conflicting State laws creating such liens . . . ." *The Lottawanna,* 21 Wall. 558, 581. In declining to invalidate these state lien laws this Court there pointed out that Congress could terminate the effectiveness of such state legislation at any time it desired to assume control.

The uniformity which the Admiralty Clause of the Constitution requires is limited to one indefinitely defined area—that involving "the essential features of an exclusive federal jurisdiction." *Just* v. *Chambers,* 312 U. S. 383, 391. Except in instances falling clearly within this area states are free to make laws relating to maritime affairs. Thus, in *Just* v. *Chambers,* Florida was permitted to provide a remedy for death due to maritime torts in Florida waters, even though such a remedy was not permissible under maritime law and not available in other states. Here Louisiana has provided a remedy for death due to maritime torts in Louisiana waters and it is therefore difficult for me to see how the present case can be distinguished from *Just* v. *Chambers.* Neither Congress nor this Court has provided or forbidden suits against insurance companies in cases like these, or attempted to establish uniform rules for the regulation of maritime insurance to the exclusion of the states. Indeed, it was not until 1870 that this Court finally decided that the regulation of marine insurance was within the jurisdiction of admiralty at all. *Insurance Co.* v. *Dunham,* 11 Wall. 1. Prior to that time, there was strong support for the belief that the states alone could regulate marine insurance. No Act of Congress and nothing this Court has said since the *Dunham* decision in 1871 has taken away the concurrent jurisdiction of states over maritime insurance policies.[1] No reason has been advanced why marine insurance, long the province of the states, so imperatively requires uniformity that we should now hold that Con-

---

[1] In the Merchant Marine Act of 1920 Congress recognized that "marine insurance companies" were operating under state laws. Section 29 of the Act defines that term to include companies "authorized to write marine insurance or reinsurance under the laws of the United States or of a State . . . ." 41 Stat. 988, 1000, 46 U. S. C. § 885 (a) (2).

gress alone can regulate it.[2]   Consequently, to enforce the Louisiana law would not impair the uniformity of maritime law, but would once again "illustrate the alacrity with which admiralty courts adopt statutes granting the right to relief where otherwise it could not be administered by a maritime court . . . ."   *Workman* v. *New York City,* 179 U. S. 552, 563.   See also *The Hamilton,* 207 U. S. 398.

Louisiana's statute, as sought to be applied here, would further the equitable aims of admiralty by providing relief not otherwise available for maritime wrongs.   For behind this "direct action" statute lies a long history of state attempts to protect the public interest by ensuring that liability policies furnish adequate protection to persons injured.   At one time insurance companies were commonly able to avoid payment of a single dollar on their policies whenever the insured was insolvent and therefore judgment-proof.   The insurance, although bought and paid for, would remain untouched while valid claims went entirely unsatisfied.   To prevent this injustice many states passed laws of one kind or another which required insurance companies to pay injured persons even though the insured had paid out no money.   The Massachusetts Supreme Judicial Court took the lead in sustaining a law of this type, Chief Justice Rugg suggesting its need to prevent liability insurance from becoming a "snare to the insured and a barren hope to the injured."   *Lorando* v. *Gethro,* 228 Mass. 181, 189, 117 N. E. 185, 189.   And,

---

[2] In 1935 when Congress was considering amendments to the Limited Liability Act, counsel for the American Steamship Owners' Association strongly contended for continued regulation of marine insurance by the states and against a federal regulation system that would have been uniform in all the states.   Hearings before House Committee on Merchant Marine and Fisheries on H. R. 4550, 74th Cong., 1st Sess. 91, 124.

despite the fact that these state statutes wrote compulsory terms and obligations into all insurance contracts, this Court sustained such a statute applying to automobile insurance. Chief Justice Taft said that ". . . it would seem to be a reasonable provision by the State in the interest of the public, whose lives and limbs are exposed, to require that the owner in the contract indemnifying him against any recovery from him should stipulate with the insurance company that the indemnity by which he saves himself should certainly inure to the benefit of the person who thereafter is injured." *Merchants Mutual Automobile Liability Ins. Co.* v. *Smart,* 267 U. S. 126, 129–130. The Louisiana statute is an application of this same principle. It expresses the public policy of Louisiana that liability insurance exists for the protection and benefit of the injured as well as the insured. *Davies* v. *Consolidated Underwriters,* 199 La. 459, 475–476, 6 So. 2d 351, 356–357. Under Louisiana's law an individual purchases liability insurance not for himself alone but also for those whom he may injure. This bargain is advantageous to the purchaser because claims against him can be satisfied in suits against the insurer.

There can be no constitutional barrier to this Louisiana law passed to protect persons injured within its borders. Consequently, unless Congress has specifically forbidden states to protect seamen this way, Louisiana's statute is valid and should be enforced.

## II.

The majority hold that the Limited Liability Act of 1851, as amended, bestows on the shipowner a right to collect all or part of the insurance money for his profit despite Louisiana's statute requiring insurance companies to make their payments directly to the families of persons injured or killed. I think this construction gives shipowners far more than Congress intended.

The Limited Liability Act provides that "The liability of the *owner of any vessel* . . . for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not . . . exceed the amount or value of the interest of such owner in such vessel, and her freight then pending." [3] (Emphasis supplied.) This Act relieves shipowners from a large part of the liability normally imposed on employers for torts of their employees. Under the Act, a shipowner need pay nothing to tort claimants if the ship is a total loss. If it is not wholly destroyed, the shipowner can simply turn a fund equal to the value of his interest in the damaged ship over to a court in a limitation proceeding. All claims against the shipowner must then be satisfied out of that fund, no matter how large the claims or how small the fund. The purpose of Congress in limiting the liability of shipowners was to encourage investment in American ships. But neither the Act nor its history indicates a purpose to encourage investment in insurance companies by limiting their liabilities. The insurance companies contend, however, that requiring them to pay their policy obligations to these claimants will somehow compel shipowners to pay out money in excess of the liability provided by the Act. For the reasons that follow I think this contention is without merit.

(a) The majority appear to hold that if the insurance companies pay out the full amount of their policies in these actions and some recovery is also had against the shipowner in limitation proceedings the shipowner will be unable to get reimbursement for that recovery from the insurers and to that extent will be "deprived of his insurance." It was conceded at the bar, however, that the

---

[3] R. S. § 4283, as amended, 49 Stat. 960, 49 Stat. 1479, 46 U. S. C. § 183 (a).

ship here is without value—a total loss. If this is true, there would be no fund in the limitation proceedings and no possibility of any recovery at all against the shipowner. Under these circumstances, the shipowner does not stand to lose a dime if the insurance companies are held liable for the full amount of their policies, and there is no reason for deferring trial of these lawsuits.

(b) Even if the ship has some value and there should be recoveries from the limitation fund, Louisiana's statute would not deprive the shipowner of any right given by the Limited Liability Act. That Act was passed to help shipowners by permitting them to escape full liability for wrongs of their agents. But not a word in it suggests that Congress also intended to give shipowners additional special privileges with respect to liability insurance or to interfere with state regulation of any type of insurance. Nor was any such expanded construction of the Act made by this Court in *The City of Norwich,* 118 U. S. 468. That case rested entirely on a holding that money from hull insurance was no part of an owner's "interest" in his ship which the Limited Liability Act required him to turn over to damage claimants. The Court was concerned only with what made up the limitation fund. The claimants here make no contention that liability insurance is part of the limitation fund. They concede that the shipowner can be made to pay out only the value of his "interest" in the damaged ship. But they insist that the shipowner should not be allowed to escape loss from even the limited liability which Congress put on him, if the result is to deprive injured persons of insurance bought to protect them. There is a vital difference between liability insurance and hull insurance with which *The City of Norwich* dealt. The latter provides recovery for loss of the shipowner's property. But liability insurance is not bought to guarantee reimbursement for loss of a shipowner's property. Its purpose is to pay for damage done

to others by the shipowner or his agents. The shipowner has an insurable "interest" in his ship; if it is lost or damaged any insurance money collected is his own. I cannot believe he has an insurable "interest" in his seamen which could possibly entitle him to reduce the already limited financial obligations the Act imposes by taking for himself insurance money which otherwise would go to compensate seamen or their families for injuries he inflicts. The result of holding that the Act gives the shipowner this insurance benefit is, at least in some circumstances, to leave him with more money after a wreck if he injures people than if he does not. It is a far cry from the decision in *The City of Norwich* that a shipowner is entitled to keep the insurance collected for loss of his own ship to today's holding that states cannot assure seamen that they instead of the shipowner can get the full benefit of liability policies bought in order to pay their just claims for injuries caused by the ship.

(c) It is said, however, that other shipowners might have to pay higher premiums and also buy more insurance if recoveries are allowed here, and that this would discourage investment in ships. How the Limited Liability Act may be read to impose a ceiling on premiums, over which the states normally have full power, is difficult for me to understand. I have searched the Act's history in vain for any support for this interpretation. Yet 103 years after the Act's passage it is discovered that Congress intended to help shipowners by preventing states from making regulations that might raise the cost of marine insurance. But Congress decided to help shipowners by reducing their obligations due to wrecks, not by reducing the prices they had to pay for carrying on their business either before or after a wreck. Construing the Act to protect shipowners from having to pay higher prices for oil or coal would be no less farfetched than construing it to keep down insurance premiums. This Court often

protests its desire to indulge every presumption in favor of the validity of state legislation. It is hard to reconcile this commendable judicial philosophy with use of attenuated inferences about increased premiums as an excuse for impairing this Louisiana law.

(d) Despite the insistence of petitioner insurance companies that these suits must be wholly barred to save shipowners from injury, it seems plain that the only real beneficiaries of such a holding would be the companies themselves. They, rather than the shipowner, would enjoy the protection sought to be written into the Limited Liability Act. But even the most generous reading of the Act gives no ground for believing that it was intended to help insurance companies, directly or indirectly. And nothing in the records of the congressional debates or reports supports such a strained interpretation. Shipowners, not insurance companies, were the group Congress wanted to help.

(e) For the above reasons I think the Limited Liability Act does not require deferring the present suits so that the shipowner can be the direct beneficiary of these insurance policies at the expense of the families of the deceased seamen. But quite apart from these reasons, the same conclusion is required by specific instructions from Congress. The McCarran Act provides that "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance . . . ." 15 U. S. C. § 1012 (b). It is unquestionably true that the McCarran Act was passed in response to this Court's decision that insurance was subject to the federal commerce power.[4] But that is no reason for giving the law an

---

[4] *United States* v. *South-Eastern Underwriters Assn.,* 322 U. S. 533.

unnaturally narrow construction squarely in the teeth of the plain, normal, everyday meaning of the language used. The Act rather shows the strong purpose of Congress to permit states to continue regulating insurance as they always had. Courts are pointedly told to leave states free to regulate "the business of insurance" in the absence of some congressional act that "specifically relates" to the same subject. The "business of insurance" includes marine insurance and by no stretch of imagination can it be said that the 1851 Act "specifically relates" to insurance. Thus the unambiguous language of the McCarran Act forbids courts to construe federal statutes such as the Limited Liability Act so as to impair a state law like Louisiana's. No legislative history can justify judicial emasculation of this language. I would not disregard its mandate.

## III.

Judicial expansion of the Limited Liability Act at this date seems especially inappropriate. Many of the conditions in the shipping industry which induced the 1851 Congress to pass the Act no longer prevail. And later Congresses, when they wished to aid shipping, provided subsidies paid out of the public treasury rather than subsidies paid by injured persons.[5]  If shipowners really need an additional subsidy, Congress can give it to them without making injured seamen bear the cost. It is significant that no shipowner has argued here against direct recoveries from the insurance companies.

Today's decision creates unnecessary delay and doubt as to recovery by the families of the *Jane Smith's* victims. The loss of their breadwinners is not to be shared by

---

[5] See Springer, Amendments to the Federal Law Limiting the Liability of Shipowners, 11 St. John's L. Rev. 14; Note, 35 Col. L. Rev. 246.

the shipping industry the seamen served. It was such results that led to efforts to spread the cost of industrial accidents and disasters through insurance and workmen's compensation laws. Acting consistently with this broad trend in the law, Louisiana has tried to make certain that all liability insurance will get to those for whose protection it was purchased. And application of Louisiana's statute under the circumstances here is also in harmony with the humane policy of the maritime law. Seamen have traditionally been the wards of admiralty, and admiralty has been increasingly solicitous to provide compensation for accidents occurring in their dangerous work. Thus both the general trend of the law and the specific bent of admiralty support the policy of the people of Louisiana which permits recovery here. No language in the Limited Liability Act forbids it; the language of the McCarran Act should compel it.