**Rafael Rodriguez EMA et al., Plaintiffs,**

v.

**COMPAGNIE GENERALE TRASATLANTIQUE (French Line) and West of England Steamship Owners Protection and Indemnity Association, Ltd., Defendants.**

**Leandro CABRANES et al., Plaintiffs,**

v.

**COMPAGNIE GENERALE TRASATLANTIQUE (French Line) and West of England Steamship Owners Protection and Indemnity Association, Ltd., Defendants.**

**Civ. Nos. 387–71, 468–71.**

United States District Court,
D. Puerto Rico.

Oct. 3, 1972.

Jimenez & Fuste, San Juan, P. R., for plaintiffs.

Vincente M. Ydrach, San Juan, P. R., for defendant Compagnie Generale Trasatlantique.

## MEMORANDUM ORDER

TOLEDO, District Judge.

On June 4, 1971 and July 1, 1971, respectively, the above-captioned actions were commenced by plaintiffs against Compagnie Generale Trasatlantique (French Line) and its insurer, West of England Steamship Owners Protection and Indemnity Association, Ltd., pursuant to the Puerto Rico Direct Action Statute, 26 L.P.R.A. § 2003, invoking diversity and maritime jurisdiction pursuant to 28 U.S.C.A. §§ 1332 and 1333. The actions are for damages arising out of the grounding and burning of the SS

ANTILLES, a vessel belonging to Compagnie Generale Trasatlantique, which occurred in the vicinity of Mustique Island, St. Vincent, Grenadines, British West Indies, on or about the first days of January, 1971.

As a result of the various claims filed formally and informally against Compagnie Generale Trasatlantique a limitation of liability proceeding was commenced by said carrier before the United States District Court for the Southern District of New York on July 30, 1971. The action was identified under Civil No. 71-3403. On said date, following the usual course in admiralty practice, Judge Edmund L. Palmieri, entered an Order restraining, staying and enjoining, until the hearing and determination of the limitation action, further prosecution of any and all actions, suits and proceedings already commenced, and the commencement or prosecution thereafter of any and all suits, actions or proceedings against Compagnie Generale Trasatlantique, or against the vessel, SS ANTILLES or against any property of said carrier, except in the limitation action, to recover damages for or in respect of any loss, damage, injury or destruction caused by or resulting from the aforesaid casualty all pursuant to the Limitation of Liability Act of 1851, 46 U.S.C.A. § 181 et seq.

After the said, Compagnie Generale Trasatlantique, had obtained the benefits of the Order aforementioned, its legal representation in the two cases now before the consideration of the Court, filed identical motions to dismiss directed to the complaints filed by the plaintiffs in both actions, specifically, said motions were filed on September 8, 1971. Immediately thereafter counsel for the plaintiffs filed a notice directed to Judge Fernandez-Badillo informing this Court that a motion to dismiss had been filed and requesting that the same be held in abeyance and not be decided by virtue of the restraining order entered by the United States District Court for the Southern District of New York in the limitation proceeding filed

therein by said Compagnie Generale Trasatlantique pursuant to the Limitation of Liability Act of the United States. Furthermore, the plaintiffs informed the Court that they had moved the United States District Court for the Southern District of New York for a change of venue of the limitation of liability proceeding to this district, pursuant to Rule F(9) of the Supplemental Rules for Certain Admiralty and Maritime Claims and 28 U.S.C.A. § 1404(a), which motion was to be entertained by Judge Edmund L. Palmieri. In view of the above facts, this Court, through Judge Fernandez-Badillo, entered an Order on September 28, 1971, whereby the motion to dismiss filed by Compagnie Generale Trasatlantique was held in abeyance until the final determination of the action for limitation of liability filed by said Compagnie Generale Trasatlantique in the United States District Court for the Southern District of New York. Subsequently, the limitation of liability proceeding referred to in this Memorandum Order was transferred to this Court by means of an Order entered to that effect by Judge Edmund L. Palmieri on November 19, 1971. The limitation of liability proceeding has been assigned to the undersigned judge and has been identified by Civil No. 914–71, "In the Matter of the Complaint of COMPAGNIE GENERALE TRASATLANTIQUE, Plaintiff, as owner of the steam vessel ANTILLES for exoneration from or limitation of liability".

On July 13, 1972, counsel for Compagnie Generale Trasatlantique once again made efforts to dismiss the present actions. This time a motion was filed requesting this Court to set aside its Order of September 28, 1971, holding in abeyance the motion to dismiss, originally filed, since by the terms of the Restraining Order entered in the limitation of liability proceeding, the purpose and intent of the court in so doing was to enjoin the prosecution of all actions and suits taken against Compagnie Generale Trasatlantique and not to enjoin the actions or proceedings that said Compagnie Generale Trasatlantique might take for its own benefit or defense against the plaintiffs. In other words, the plaintiff in the limitation of liability action, co-defendant herein Compagnie Generale Trasatlantique, understands the Restraining Order referred to herein as permitting it to prosecute these two actions; whereas, the opposing parties, plaintiffs herein, would be enjoined from defending against said prosecution. We agree with the plaintiffs that such a proposition cannot stand.

Although limited liability has been a part of the maritime law of almost all ship-owning countries, it was initially rejected by American courts. The Rebecca, 20 Fed.Cas. p. 373, No. 11,619 (D.Me., 1831). However, with the rise of the first great American Merchant Marine Congress was persuaded to reintroduce the limitation principle by statute. An act for the limitation of ship-owners' liability was passed on March 3, 1851, with no debate in the House and only part of a day's debate in the Senate. 9 Stat. 635. There, inexplicably matters rested for a generation. Not one of the intended beneficiaries of the Act, the shipowners, invoked its protection until the owners of the steamer, CITY OF NORWICH, which had sunk following a collision in the Long Island Sound on the night of the 18th, of April, 1866, sought to limit their liability in a case which reached the Supreme Court of the United States in 1871 as Norwich & New York Transport Co. v. Wright, 80 U.S. (13 Wall) 104, 20 L.Ed. 585 (1871). The *Wright Case* brought home to the members of the Supreme Court the fact that the Act of 1851 was so imperfect, fragmentary and ambiguous as to be unworkable. Customary in this instance the court resorted to the extraordinary device of supplementing the statute by rules of the court which were issued in 1872, the year following the decision in the *Wright Case*; the Admiralty Rules on Limitation, subsequently several times revised, continued to play an important role in limitation litigation. The rules prescribing the practice

in limitation proceedings were issued on May 6, 1872, 80 U.S. (13 Wall), XII to XIV. Nowadays and since the unification of the civil and admiralty practice which occurred by amendment to the Rules of Federal Civil Procedure in 1966, both the civil and admiralty procedure have been consolidated and there exists a separate body of six Supplemental Rules for Certain Admiralty and Maritime Claims of which Rule F governs the limitation proceeding.

The *Wright Case*, together with the issuance of the rules, sufficed to bring the limitation act to the attention of the Admiralty Bar with the result that the neglect in which the Act had mouldered for twenty years was replaced by a continuing stream of cases in which shipowners petitioned for limitation. A number of these cases reached the Supreme Court of the United States and during the "70's and 80's" a series of landmark opinions authoritatively determined most of the principal issues, both of substance and procedure arising out of the Limitation of Liability Act. See for example, Butler v. Boston & Savannah Steamship Co., 130 U.S. 527, 9 S.Ct. 612, 32 L.Ed. 1017 (1889); Ex Parte Phenix Insurance Co., 118 U.S. 610, 7 S.Ct. 25, 30 L.Ed. 274 (1886). In addition to the court's work in clarifying vexing problems under an imperfectly drawn statute, Congress on several occasions during the same period amended the Act to extend its coverage. See for example, 16 Stat. 458 (1871); 49 Stat. 960 (1935).

The formative period for limitation law was the last quarter of the 19th century. It may be that counsel for the shipowners, in making no use of the Act between 1850 and 1870, were wise in their generation and that their clients reaped an unexpectedly rich harvest in the benign climate of the latter part of the century when the sun shone on invested capital as it has done in no other period of our history. The results were astonishingly favorable to the shipowners, and the statute, as expounded by the Supreme Court and supplemented by the industry of Congress, was expanded almost beyond belief. The purpose of the 1851 Act had been to put American shipowning interests on a competitive equality with British interests, so far as limitation of liability was concerned. English limitation law, it might have been supposed, was the obvious analogy to which our courts would look in developing our limitation law. However, the Supreme Court almost from the beginning cut American law loose from English influence by elaborating the theory that the 1851 Act had reincorporated in our law the theory of limitation as found in the "general maritime law"; thus in case of need our statute could be supplemented by general principles or particular doctrines derived from that vague corpus, from the Code of Oleron on down. By the application of its general maritime law theory, which reserved a wide field for judicial maneuver, the Supreme Court had erected by 1900 or thereabouts a structure of limitation law which gave shipowners much more protection than the British counterpart. Not only did the case by case holdings almost uniformly grant limitation, but the early opinions furnish a treasure-house of quotable passages—still regularly quoted in the briefs of counsel—on the proposition that the Limitation Act must be liberally construed so as to effectuate its beneficent purposes.

Since approximately 1930 the early enthusiasm, both legislative and judicial, for the limitation principle has cooled. In 1935, the Congress enacted the first substantial amendments to the Limitation Act since the 1880's; 49 Stat. 960 (1935), 46 U.S.C.A. §§ 183, 185; these amendments were adverse to the shipowning interests, the most important being a provision setting up in the case of claims based on loss of life and bodily injury, a minimum limitation fund of $60. per ton. In the early '30's the Supreme Court limited the freedom with which shipowners, by filing a petition for limitation, could transfer to the juryless forum of the admiralty proceed-

ings which plaintiffs, under the saving to suitors clause, had elected to bring on the civil side. Langnes v. Green, 282 U.S. 531, 51 S.Ct. 243, 75 L.Ed. 520 (1931); Ex parte Green, 286 U.S. 437, 52 S.Ct. 602, 76 L.Ed. 1212 (1932).

In 1954, the Supreme Court in Maryland Casualty v. Cushing, 347 U.S. 409, 74 S.Ct. 608, 98 L.Ed. 806 (1954), in a case which, without overruling, impaired the authority of one of the earliest landmark cases. Justice Black, speaking for four members of the court divided 4–4–1, wrote at page 437, 74 S.Ct. at page 623:

"Judicial expansion of the Limited Liability Act at this date seems especially inappropriate. Many of the conditions in the shipping industry which induced the 1851 Congress to pass the Act no longer prevail. And later Congresses, when they wished to aid shipping, provided subsidies paid out of the public treasury rather than subsidies paid by injured persons".

Justice Black's opinion shows that there is at least some reason to believe that the judicial attitude in the second half of the twentieth century will be on the whole hostile to the limitation idea. Such an attitude reflects, it is suggested, not so much hostility to the shipping business but a recognition of the fact that the Limitation Act, passed in the era before the corporation had become the standard form of business organization and before present forms of insurance protection such as protection and indemnity insurance was available, shows increasing signs of economic obsolescence.

Under this framework let us examine the question posed for decision in this case. As we have stated Compagnie Generale Trasatlantique understands the Restraining Order referred to herein as permitting to prosecute this action, whereas, the opposing parties, plaintiffs herein, would be enjoined from defending against said prosecution. We have stated that such a proposition cannot stand because at first glance it is contrary to legal logic. Notwithstanding the question was not squarely decided by any federal court until 1939 in the case of The Quarrington Court, Petition of Court Line, Limited, 102 F.2d 916 (2nd Cir. 1939) cert. den. 307 U.S. 645, 59 S. Ct. 1043, 83 L.Ed. 1525 (Court Line Limited v. Isthmian Steamship Company (1939) decided by Circuit Judges Learned Hand, Augustus Hand and Harrie Chase. In said case, after a limitation of liability had been initiated, the steamship company, movant in the limitation of liability proceeding, invoked an arbitration clause in a charter agreement and demanded that a certain claim be arbitrated in England and that it be excepted from the injunction in the limitation proceeding. The district court understood that the arbitration was to be excepted but the Court of Appeals for the Second Circuit disagreed. In so deciding, Judge Hand said that the shipowner should be required, once it files a limitation of liability to "adjust its disputes . . . in the limitation proceeding and not seek to have two strings to its bow in order that it may invoke limitation or exoneration in the arbitration proceeding under the English law, and, if it fails, still seek similar relief under ours".

As stated in the above-cited case, the purpose of a limitation proceeding is not merely to limit liability but to bring all claims into concourse and settle every dispute in one action. It is quite evident from the case and from the other case law cited therein that when a shipowner elects to file a limitation of liability proceeding, the multiple actions enjoined by said limitation of liability proceeding are to be stayed, until the decision of the limitation itself. For that reason, all parties are estopped from prosecuting these actions in relation to Compagnie Generale Trasatlantique, except that the plaintiffs are entitled to prosecute the action against the other co-defendant, West of England Steamship Owners Protection and Indemnity Association, Ltd., which is an insurance underwriter and pursuant to the applicable law can

be sued in a direct action jurisdiction like Puerto Rico even if the shipowner has filed a limitation of liability proceeding. See, In Matter of Independant Towing Company, Inc., as Owner of Tug Itco III, 242 F.Supp. 950 (E.D.La. (1965)).

In view of the aforementioned co-defendant, Compagnie Generale Trasatlantique's motion of July 13, 1972, requesting the setting aside of an Order entered by this Court on September 28, 1971, holding in abeyance a motion to dismiss filed by said co-defendant on September 8, 1971, shall be and is herewith denied.