WRIGHT v. BARTHOLOMEW et al.

(Supreme Court, Appellate Division, Fourth Department. November 12, 1901.)

BILLS AND NOTES — BONA FIDE HOLDERS — QUESTIONS FOR JURY — DIRECTING VERDICT.

The payees of notes, living in a distant state, without any apparent reason therefor offered them at a great discount to plaintiff by letter. Plaintiff made no inquiry as to the origin of the notes, and, after a brief inquiry as to the responsibility of some of the makers, purchased them by telegram at a discount yielding interest substantially twice the legal rate. Plaintiff had previously purchased notes from such payees, and had trouble in collecting them; and his testimony as to the contents of the letter inclosing the notes to him, and as to the fact that he acquired no information as to the notes, other than he stated, was uncorroborated. Such notes, because of fraud, were unenforceable by the payees. *Held*, that whether plaintiff was a bona fide holder of such notes was for the jury.

Appeal from trial term Chautauqua county.

Action by Henry R. Wright against George Bartholomew and others, impleaded. From a judgment in favor of plaintiff, and an order denying defendants' motion for a new trial on the minutes, defendant Bartholomew and eight others appeal. Reversed.

Argued before ADAMS, P. J., and McLENNAN, SPRING, WILLIAMS, and HISCOCK, JJ.

Lester F. Stearns, for appellants.
Frank W. Stevens, for respondent.

HISCOCK, J. This action was brought by plaintiff to recover upon a promissory note for $1,000 and interest made by appellants, and also purporting to be made and signed by 10 other parties, and which note was dated December 7, 1896, and payable, with interest, one year after August 1, 1897, at the Fredonia National Bank, to the order of McLaughlin Bros. The appellants have urged, and do urge, as defenses to said note, in substance: First, that it was procured from them by fraud and false representations, and that plaintiff is not such a bona fide holder for value as to be able to enforce it against them; and, secondly, that said note had no valid inception between them and the payees, and that, therefore, when plaintiff purchased the same from said payees at a discount of more than 6 per cent., it became tainted with usury, and is void. The trial judge, apparently assuming that the note was procured from these defendants by fraud and improper methods, still held, as mat-

ter of law, that they had failed to establish either defense, and directed a verdict for plaintiff, limiting the amount thereof, however, to the amount actually paid by him for the note. It appears that this note is one of a series of three, all of like date and like amount, and like payees and like makers (with one immaterial exception, the other two being payable one and two years, respectively, after the one in suit), and that the validity of the other two notes of said series is left to be determined by the event of this litigation. McLaughlin Bros., the payees of the note, reside in Ohio; the plaintiff lives in Albany; and the defendants, who in most instances, at least, are farmers, live in Chautauqua county.

Briefly, this series of notes had its inception in the following circumstances: In the fall of 1896 McLaughlin Bros., through agents and representatives who varied at different times, proposed to these defendants the scheme of selling a stallion for $3,000, to 30 farmers, each of whom was to pay $100, and receive stock representing his interest in said horse. The proposers of this scheme represented themselves as anxious that no one should take more than one share, and to these defendants represented that all shareholders would be perfectly responsible. Two horses were exhibited, the second having been exchanged for the first in the course of the transaction. The defendants were induced to sign the note in question by various representations as to the value and character of the horse, and also as to the agreement and responsibility of other parties than themselves who were represented as having entered upon the plan. It was also agreed with some or all of them at the time when they respectively signed the notes that a meeting of all shareholders should be held in the near future, at which the horse should be produced and the transaction closed up, and that anybody dissatisfied at that time would have the right to withdraw, and his note be surrendered to him. As a matter of fact, some of the apparent subscribers to this scheme, other than defendants, had not so subscribed as to be bound, and apparently none of those who had made valid subscriptions outside of these defendants was responsible, and some of the purported signers have never been found. The promised meeting of all the purported stockholders and signers of the notes was never held, and the horse was never delivered to or received by these defendants. There were many other details, which it is unnecessary to recapitulate, because respondent neither upon the trial nor upon this appeal has really controverted the claim of appellants that these notes were by McLaughlin Bros. and their agents so obtained by fraud and false representations that they could not be enforced as between the original parties. We pass, therefore, to plaintiff's connection with the notes, as bearing upon the question whether he occupies a position so much higher than that of the original payees that he can enforce them. Plaintiff claims: That all of his negotiations with reference to the purchase of the notes were by mail and telegram. That a few days subsequent to the date of the notes he received a letter from McLaughlin Bros. inclosing copies of them. That he thereupon sent to a relative of his at Dunkirk such copies of the notes, with a letter inquiring concerning the makers.

That upon December 17th he received a letter from his correspondent stating, in substance, that, as he personally did not know many of the parties, he had called upon the cashier of the Fredonia Bank, who said that some of the makers (especially one Aldrich) were good for the whole amount; that one of the makers was not considered good, and that others did not live around Fredonia, or at least they or their standing were unknown; that probably some of the makers were good, if not all of them; and that he considered the notes, as a whole, perfectly good and safe. That plaintiff then telegraphed to McLaughlin Bros. an offer for the notes, in response to which he received a telegram that he could have them for $2,550, and in response to which he, in turn, telegraphed: "Give twenty-five hundred dollars. Indorse and mail. Will send exchange." That without any further negotiations the notes were sent on to an Albany bank for delivery upon payment of $2,500, which he paid. He claims to have made no further inquiries and to have had no further information in regard to the notes, their origin, or their consideration. They were indorsed by McLaughlin Bros., whom he considered perfectly responsible. He had known said payees for eight or ten years, and during that time had bought many other notes, although his business was not that of a banker or broker, and he had never been accustomed to buy notes from other people, with the exception of occasionally taking notes as a collateral security in the insurance business. The father of the payees lived in Albany county, near plaintiff, and is said by some of the defendants to have taken part in promoting the scheme which led up to the giving of these notes; but, although plaintiff had known him for many years, no inquiries were made of him. One of the defendants (Haggerty) testified that after the trouble arose over these notes he called upon plaintiff upon one occasion, and that plaintiff talked with him with reference to prior purchases of similar notes from McLaughlin Bros., and in fact showed him some other notes which were written upon the same form of blanks as these in question; that in the course of the conversation witness asked him "if he made a business of purchasing these notes. He said he did sometimes, when he got them cheap. I said to him: 'I should think it would be scaly business. You don't know anything about these people.' He said: 'I don't care nothing about them. McLaughlin Bros. back these notes, and I will be safe.'" Also that he asked plaintiff "if he didn't sometimes have trouble in collecting these notes. He said, 'Yes,' sometimes he had trouble in collecting these notes; but he said it was very easy to scare the farmers into it; they would come right in and settle." Something was also said about plaintiff's brother being engaged with McLaughlin in selling horses to farmers as the one in question was sold. Some of the evidence of this witness was disputed by plaintiff, but upon this appeal we are, of course, to assume in favor of appellants all disputed facts, and give them the benefit of all inferences which a jury might have been permitted to draw therefrom.

There can be no question in this state now as to the rule which prescribes plaintiff's rights and burdens in this case, upon the branch

which we are now discussing. After defendants had established, at least as an issue of fact to be submitted to the jury, the proposition that this note had been obtained from them by fraud, and could not be enforced in the hands of the original payees, the burden was imposed upon plaintiff, if he would occupy a better position wherefrom he might enforce it, of showing that he had obtained such note for value, before maturity, and in good faith. This general rule has been stated in various forms in various cases. In Bank v. Diefendorf, 123 N. Y. 191, 201, 25 N. E. 402, 10 L. R. A. 676, it is stated that holders of negotiable paper bring themselves within the conditions which the law prescribes to establish the character of a bona fide holder "only when they have purchased such paper in good faith in the usual course of business, before maturity, and for full value, and without notice of any facts affecting the validity of the paper." In Hall v. Wilson, 16 Barb. 548, it is stated that, "to entitle the holder of negotiable securities, which have been fraudulently, feloniously, or without consideration, obtained and put in circulation, to the benefit of this rule, he must have become such holder in good faith, for a full and fair consideration, in the usual course of business, and without notice of the defect or infirmity in the title." In Vallett v. Parker, 6 Wend. 615, it is said that, when a note has been lost or stolen or fraudulently put in circulation, the plaintiff, in order to recover, must show "that he came lawfully and fairly by it, and paid value for it." It is likewise held in the Diefendorf Case, above referred to (page 202, 123 N. Y., page 405, 25 N. E., and page 682, 10 L. R. A.), "that a want of good faith in the transaction is fatal to the title of the holder, and that gross carelessness, although not of itself sufficient, as a question of law, to defeat title, constitutes evidence of bad faith." We do not regard the rule as stated in Cheever v. Railroad Co., 150 N. Y. 59, 66, 44 N. E. 701, 34 L. R. A. 69, 55 Am. St. Rep. 646, relied upon by respondent, as in any way varying or modifying the general rule evidenced by the above citations. It is simply held in that case that a person purchasing negotiable paper is not bound, at his peril, to be on the alert for circumstances which might possibly excite the suspicion of wary vigilance; that such a person does not owe the party who puts the paper afloat the duty of active inquiry in order to avert the imputation of bad faith; that the test is of honesty and good faith, and not a speculative one as to his diligence or negligence. It is concededly the rule that the test is of good faith, and not of negligence; but such concession does not impair the holding in the Diefendorf Case, which is cited in the case last mentioned,—that gross negligence may amount to evidence of bad faith. As we have stated, there is no opportunity for material difference of opinion as to what is the general rule governing the status of a holder of paper originated in fraud. The main difficulty must arise in determining under that rule, by the facts of each particular case, whether the holder has or has not established his position in such a way as to entitle him to enforce such paper. Therein must lie the only difficulty upon this branch of the case in determining this appeal. After careful consideration, we reach the conclusion that in this case plaintiff did not so meet the burden which

was imposed upon him, in view of the origin of this note, as entitled him to have the court say, as matter of law, that he should recover. If we leave out of account for the moment plaintiff's prior acquaintance and relations with the payees, we believe that the conclusion must almost inevitably come that his conduct in taking this note was so unusual that it could not be said to indicate bona fides, certainly as a matter of law. Payees living in a distant state, without any apparent reason therefor, such as need of money, with great speed after their making, offer to him notes made by strangers living in a distant part of the state, and payable there, at a very substantial discount or "shave." The notes themselves, upon their face, with the unusual number of makers, naturally suggest the question, "What kind of a transaction produced such notes?" No inquiry is made to secure an answer. No information is obtained or sought to answer such question. A brief correspondence is resorted to, to learn the responsibility of a very few of the makers, and then, in the briefest manner possible, by telegram, the notes are purchased at a rate of discount yielding interest substantially twice the amount of that authorized by law, and, as we may take judicial notice, prevailing in the country for good paper at the time the notes were purchased. Independent of their former relations, the act of McLaughlin Bros. in seeking out the plaintiff, who was not a banker or broker, instead of going to their own banker, or to a bank in the locality where the notes were made, and their readiness to sacrifice a large percentage of the principal of the notes on their sale, were of themselves calculated to suggest to a man of ordinary experience that there was something unusual about them. If, under such circumstances, plaintiff had contented himself with making the inquiries which he did make, and had refrained from making others which readily suggest themselves to the mind, he would, we think, have fairly come within the principles applied in the Case of Diefendorf, cited supra to the conduct of the plaintiff's cashier in the transaction there under review. In that case the omissions of the cashier were regarded as very significant upon the question of bad faith. The plaintiff, however, is entitled to have us take into account the prior relations between him and McLaughlin Bros., and it is, of course, our duty to do so. But in doing this we do not find any help for plaintiff. He had been accustomed to purchase notes before, as we infer from the evidence, taking liberal discount. This note was apparently of the same general character as those others. Plaintiff "imagined" it arose in horse business. Those others had been evolved under such circumstances that there had been trouble with the collection of them; that the makers had protested against, and objected to their payment as valid obligations, and it had been necessary to "scare" them into paying. So that, when we take into account the facts of this prior relationship, we have added that these notes which plaintiff was purchasing upon this occasion were of the same general class as those which he had secured before, and over the collection of which he had had trouble, resulting in litigation, or the necesssity of threatening litigation. The inquiry must naturally have suggested itself to his mind whether the origin of these notes was surrounded by such cir-

cumstances as would render the makers unwilling to pay them, and compel resort by him to "scaring" or coercive processes. It seems to us that all of these circumstances presenting themselves to the mind of a fair man, having any sort of regard for his own security, and any desire to avoid illegitimate and unsavory circumstances in the purchase of so large an amount of paper, must have prompted an inquiry somehow, somewhere, as to the origin and history of these notes. It was very easy to have made it. The letter which plaintiff wrote to McLaughlin Bros. about the notes, and of the contents of which we are largely in ignorance, might very easily have contained an inquiry in regard to them. In fact, it is difficult to conceive of a man intending to purchase them writing such a letter without asking, in some form, what these notes were given for. It would have occasioned no extra trouble when the plaintiff's relative, Moon, made his investigation as to the responsibility of the makers of this note, to have asked some one of them how he came to give the note. It would have been a simple matter to have asked the father of the payees, who lived near plaintiff, if he knew anything about their origin. In fact, to have refrained, as plaintiff did, from doing any of these things or making any of these inquiries, indicates to our minds either an absolutely willful and grossly negligent indifference as to the origin of the notes, or else an intention to refrain from knowing about them for some other reason. Upon all of the evidence in this case, the thought obtrudes itself that the relations between plaintiff and McLaughlin Bros. were well defined in their minds, and had definite objects and purposes. This was evidently not the only transaction that McLaughlin Bros. undertook in the way of selling a horse. If the testimony in this case fairly illustrates what took place upon such purported sales, we may well understand that they would have difficulty in collecting the notes resulting from them. Neither would they be apt to obtain much assistance from procuring the discount of such notes in any reputable bank; for such bank, upon objections being made to the payment of notes such as are urged in this case, would be apt to insist upon McLaughlin Bros. taking up their notes, rather than engage in litigation over them with the makers. This does not seem, however, to have been the case with plaintiff. By selling to him their notes he was placed in a position where he could urge that he was a bona fide holder for value, and therefore exempt from defenses that might prevail as against the original payees, and he does not seem to have been unwilling to undertake litigation which might ensue from the collection of such notes. McLaughlin Bros. made themselves liable as indorsers to him. Therefore there was little opportunity for loss to him. On the other hand, if he succeeded, McLaughlin Bros. really obtained the benefits of his litigation, less the amount of the liberal discount allowed to plaintiff, and which made the relationship advantageous to him.

We think there was still another reason why this case should have been submitted to the jury. Plaintiff relied upon his own oral evidence with which to meet the burden of showing that he was a bona fide holder for value. As to some of the things which he did he is

so corroborated by undisputed letters and telegrams that his evidence would not come within the rule requiring the credibility of an interested witness to be passed upon by the jury. But, as we regard it, it was necessary to plaintiff's case that his evidence should not only be inclusive, but exclusive, and deal not only with affirmatives, but with negatives; that he was called upon not only to state what he did, but also to show that he had no other information or knowledge or notice as to or of the origin and consideration of these notes. Thus, in Vosburgh v. Diefendorf, 119 N. Y. 357, 365, 23 N. E. 801, 16 Am. St. Rep. 836, it was said that it was necessary for the plaintiff, in order to entitle him to recover, to show that he had no knowledge or notice of the fraud with which the instrument was tainted. The same rule was laid down in Smith v. Weston, 159 N. Y. 194, 199, 54 N. E. 38, and apparently in Bank v. Diefendorf, 123 N. Y. 191, 196, 25 N. E. 402, 10 L. R. A. 676. Plaintiff apparently recognized the extent of his obligations in this respect, for, in response to the questions of his own counsel, he testified that he knew nothing about these notes, or how they were procured, etc. As to the contents of the original letter from McLaughlin Bros. inclosing these notes to him, as to his letter to Mr. Moon, and as to the fact that in the course of all of these transactions he acquired no information or knowledge other than he has stated, his testimony stands uncorroborated; and its credibility was, we think, a question for the jury. Bank v. Diefendorf, supra.

The conclusions which we have reached upon the questions discussed render it unnecessary to consider the other defense, of usury, urged by these defendants, in reaching the determination that the judgment and order appealed from should be reversed, and a new trial had, with costs to appellants to abide event. All concur.

Judgment and order reversed, and new trial granted, with costs to appellants to abide event.