In the Matter of the **CENTRAL RAIL- ROAD COMPANY OF NEW JERSEY, Debtor.**

Appeal of George P. BAKER et al.

No. 71–1067.

United States Court of Appeals, Third Circuit.

Argued Jan. 6, 1972.

Decided Nov. 7, 1972.

858

Richard R. Bongartz, Westport Harbor, Mass., Carmine J. Liotta, Elizabeth, N. J., for appellant.

Charles J. Milton, Milton, Keane & DeBona, Jersey City, N. J., for trustees.

Raymond J. Lamb, Lamb, Blake, Hutchinson & Dunne, Jersey City, N. J., for appellees Reading Co.

Before KALODNER, ADAMS and MAX ROSENN, Circuit Judges.

## OPINION OF THE COURT

KALODNER, Circuit Judge.

The appellants challenge an order of the federal district court for the District of New Jersey, sitting in bankruptcy, which concerns the distribution of a fund in the Registry of the federal district court for the Southern District of New York, sitting in admiralty.

The challenge is premised on the contention that the Admiralty Court has exclusive jurisdiction as to the distribution of the fund in its Registry, fruit of a settlement of a limitation of liability proceeding under the provisions of 46 U.S.C.A. §§ 183 and 186, and thus the Bankruptcy Court erred in adjudicating, in a Memorandum opinion on which its challenged Order was predicated, the ultimate distribution of the fund in the Admiralty Court.

The sum of the appellees' contention is that the Bankruptcy Court "has paramount jurisdiction to determine the issue" as to the distribution of the fund in the Admiralty Court, and that the Bankruptcy Court did not err in its ad-

judication as to the respective rights of Claimants to the fund.

The following facts are undisputed:

On March 3, 1966, the vessel Santa Isabel, owned by Grace Line, Inc., rammed and damaged a drawbridge which spans the Raritan River between South Amboy and Perth Amboy, New Jersey. The drawbridge was part of the 39.36 miles of railroad and appurtenant facilities, extending from Perth Amboy to Bay Head, New Jersey, owned and maintained by The New York and Long Branch Railroad Company ("Long Branch"), which in turn is owned in equal shares by The Central Railroad Company of New Jersey ("Central") and The Pennsylvania Railroad Company ("PRR").[1] Long Branch, in an Operating Agreement entered into with Central and PRR on January 31, 1930,[2] granted them the joint use of its tracks and facilities.

On March 4, 1966, Central, by letter, advised PRR that its cash position prevented it from advancing to Long Branch its share of the expenses incurred by the emergency situation. After stating that *"there is complete liability on the part of the Grace Lines . . ."* and *"[t]hus, we should reasonably expect to recover all of the costs and losses involved in due course,"* the letter requesting PRR to make *"whatever cash advances may be necessary"* to Long Branch, with the assurance that Central would pay PRR interest on Central Railroad's proportion of such advances as may be necessary, "if, for any reason, it is not recovered from the insurance carriers." (emphasis supplied). PRR acceded to Central's request. It advanced to Long Branch $740,482.95 to meet its emergency expenses—PRR's half share and Central's half share.

---

1. The Pennsylvania Railroad Company merged with The New York Central Railroad Company in February 1968. The merged railroad became Penn Central Transportation Company in May 1969, and the latter filed a petition for reorganization under Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205 et seq., on June 21, 1970.

2. The 1930 Agreement extended for a 999-year term an Agreement between Long Branch, PRR and Central dated January 2, 1888.

On April 12, 1966, Grace Line, Inc. filed a petition for exoneration from or limitation of liability with respect to the damage to the Raritan River drawbridge in the United States District Court for the Southern District of New York, Docket No. 66 AD 363, in admiralty.

On May 23, 1966, Long Branch, PRR and Central filed a claim in the admiralty proceeding against Grace Line, Inc. and the S. S. Santa Isabel in the aggregate amount of $1,700,000.00 made up as follows: Long Branch $900,000.00; PRR $300,000.00 and Central $500,000.00.

On March 23, 1967, Central filed a petition for reorganization under Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205 et seq., in the United States District Court for the District of New Jersey ("Reorganization Court").

Late in 1968, counsel for Long Branch, PRR and Central in the admiralty proceeding, recommended they accept a settlement of $1,150,000.00 from Grace Line, Inc., subject to payment of a counsel fee of $110,000.00. "A Formula for Distribution of Grace Line Settlement" was then agreed to by the Claimants under which PRR was to receive $834,251.02 net and Central $205,748.98 net. The allocation to PRR included these items: (1) $740,482.95 in reimbursement of PRR's advances to Long Branch in its own behalf and in Central's behalf; (2) $84,889.94, PRR's consequential damages by reason of the drawbridge accident; and (3) $8,878.13, balance of $34,989.13 interest owed by Central to PRR on the latter's advance of $370,241.47 to Long Branch in Central's behalf, after crediting Central with $26,111.00, its share of the proceeds of sale of two parcels of real estate owned by Long Branch, which had been distributed to PRR. The $205,748.98 allocated to Central under the Formula was in reimbursement of its consequential damages.

On January 8, 1969, Central's Trustee in Bankruptcy filed a petition with the Reorganization Court requesting authorization of (1) the $1,150,000.00 settlement with Grace Line, Inc.; (2) payment of a $110,000.00 counsel fee out of the proceeds of the settlement; and (3) distribution of the $1,040,000.00 net proceeds of the settlement—$834,251.02 to PRR and $205,748.98—in accordance with "the terms of the June 23, 1966 agreement concerning the distribution of settlement funds."

On August 6, 1969, the Reorganization Court, following hearings in January and March 1969, entered an "Interim Order" authorizing Central's Trustee to join in the $1,150,000.00 settlement and payment of $110,000.00 legal fees. The Interim Order was "conditioned" upon the deposit of the net proceeds of the settlement "in the Registry of the United States District Court for the Southern District of New York." It further specified "that the Trustee shall take no further action with regard to the distribution of such proceeds until after determination by this Court of the issues presented on Trustee's petition herein."

On September 5, 1969, the Admiralty Court entered a "Final Judgment and Final Injunction" which adjudged Grace Line, Inc. "entitled to shipowner's statutory limitation"; ordered it to pay $1,150,000.00 to Long Branch, PRR and Central "in full settlement of and satisfaction of their claims," less $110,827.04 counsel fee and costs; and directed that the $1,039,172.96 balance be converted into an interest bearing security or time deposit registered in the names of Long Branch, PRR and Central, and "deposited in the Registry of this Court, subject to the further order of this Court regarding distribution of the monies represented by said security." (emphasis supplied).

On August 25, 1970, the Reorganization Court filed a Memorandum opinion denying approval of the request made by Central's Trustee in his January 8, 1969 petition, for authorization "to abide by the terms of the June 23, 1966 agreement concerning the distribution of settlement funds," under which PRR was to receive, inter alia, the $740,482.95 it

had advanced on its own behalf and that of Central to Long Branch.

The Reorganization Court, in its Memorandum, *adjudicated the legal rights of PRR and Central* with respect to the settlement proceeds in the Registry of the Admiralty Court, and further, it *fixed the specific amounts of the payments to be made out of the Registry to PRR and Central.* In doing so, the Court held that PRR was entitled only to the $370,241.48 it had advanced in its own behalf to Long Branch, and $84,889.94, representing the consequential damages of $147,589.94 it had suffered as a result of the damage to the Raritan drawbridge, less $62,700.00, PRR's share of the $110,000.00 counsel fee. PRR, the Court held, was not entitled to recoup from the Registry, the $370,241.47 it had advanced to Long Branch in behalf of Central because, in the Court's view, it was not a "subrogee" of Central as to this advance, but merely an "unsecured creditor" of Central with respect to it. These holdings were based on the Court's construction of letters of agreement exchanged by PRR and Central in June and July 1966 with reference to PRR advances to Long Branch in Central's behalf. After stating that "[t]he letters of agreement between PRR and the Debtor [Central] *clearly expressed their understanding of the transaction* which was the subject thereof," the Court construed the letters as agreeing "that PRR would look to a specific source (the lawsuit against Grace Lines) for payment, but that the Debtor, *regardless of whether or not that source turned out to be fruitful, assumed an overriding obligation to repay the advances made on its behalf by PRR.*" The letters of agreement, said the Court, "constituted a security agreement within the meaning of N.J.S.A. 12A:9–105(h), 12A:1–201(3)," with respect to the fruits of the settlement of the limitation proceeding, and "[b]ecause PRR has not followed the statutory requirement [of the New Jersey Uniform Commercial Code] by filing a financing statement covering its security interest, such security interest was not perfected under state law," and as a consequence "[t]his unperfected security interest is subordinate to the rights of a person who becomes a lien creditor without knowledge of the security interest. N.J.S.A. 12A:9–301(1)(b)." (emphasis supplied).

On October 13, 1970, the Reorganization Court filed Order No. 368, predicated on its holdings in its Memorandum. After stating the conclusion reached in its Memorandum "that the proposed distribution of the settlement fund should not be approved since such distribution would effectuate an illegal priority of PRR," Order No. 368 "ordered" Central's Trustee to "join with" PRR and Long Branch, "in taking all steps necessary and appropriate to accomplish, without prejudice to the rights" of PRR and Long Branch, the following:

"(1) Withdraw from the Registry of the United States District Court for the Southern District of New York, the sum of $370,241.48, plus interest accrued thereon representing the money advanced by PRR on its own behalf, and to pay said sum to PRR;

"(2) Withdraw from said Registry the sum of $84,418.53, representing the consequential damages ($147,589.-94) suffered by PRR as a result of the damage to the drawbridge, less PRR's share of the counsel fee and disbursements ($63,171.41) and pay said sum of $84,418.53, plus interest accrued thereon, to PRR;

"(3) Withdraw from said Registry the sum of $205,393.35, representing the Debtor's consequential damages, after adjustments, and less the Debtor's share of the counsel fee and disbursements ($47,655.63) and to deposit said sum of $205,393.35, plus interest accrued thereon, in Debtor's general account; and

"(4) *The Trustee is hereby instructed to take appropriate action to obtain for the Debtor the undistributed balance.*" (emphasis supplied).

On this appeal from Order No. 368, appellants contend primarily that (1) the Admiralty Court has exclusive jurisdiction as to the distribution of the fund, or its proceeds, in its Registry, and thus the Reorganization Court erred in adjudicating rights to the distribution of the fund; and (2) the Reorganization Court erred in holding that PRR was not entitled to distribution from the Registry of the $370,241.47 it had advanced to Long Branch in behalf of Central.

On the score of their first contention, appellants urge that the Reorganization Court, both in its Memorandum and Order No. 368, "assumes to *distribute funds* actually in custody of the Admiralty Court in connection with the limitation proceeding," and "*directs eventual disposition* of the fund on the basis of the Reorganization Court's own view of the questions involved, instead of leaving such disposition to the Admiralty Court where the fund is." (emphasis supplied).

On review of the record, we subscribe to the appellants' stated contentions.

■ The threshold question presented is whether the Admiralty Court's jurisdiction is exclusive with respect to distribution among claimants of a fund in its possession which is the fruit of a settlement in a statutory limitation of liability proceeding where, as here, the claims exceed the fund.

The question must be answered in the affirmative.

■ It has long been settled that once an Admiralty Court acquires jurisdiction in a limitation of liability proceeding, its jurisdiction is exclusive of all other forums, where the amount of the claims exceeds the value of the vessel and its freight. Providence & New York Steamship Company v. Hill Manufacturing Company, 109 U.S. 578, 594–595, 3 S.Ct. 379, 617, 27 L.Ed. 1038 (1883).

The vitality of *Providence* was reaffirmed in Maryland Casualty Co. v. Cushing, 347 U.S. 409, 416, 74 S.Ct. 608, 98 L.Ed. 806 (1954). There Mr. Justice Frankfurter, speaking for the Court, said at page 417, 74 S.Ct. at page 612:

"The elaborate notice provisions of the Admiralty Rules [Nos. 51–54, 334 U.S. 864] are designed to protect injured claimants. They ensure that all claimants, not just a favored few, will come in on an equal footing to obtain a pro rata share of their damages. *To permit direct actions to drain away part or all of the insurance proceeds prejudices the rights of those victims who rely, and have every reason to rely, on the limitation proceeding to present their claims.*" (emphasis supplied).

In Hartford Accident & Indemnity Co. v. Southern Pacific Co., 273 U.S. 207, 47 S.Ct. 357, 71 L.Ed. 612 (1927), the Court stressed the equitable nature of a limitation of liability proceeding, and declared that "[i]t looks to a complete and just disposition of a many-cornered controversy . . . ."

In doing so, the Court, after citing *Providence*, and its progeny, said (pp. 215–216, 47 S.Ct. p. 359):

"It is quite evident from these cases that this Court has by its rules and decisions given the statute a *very broad and equitable construction* for the purpose of carrying out its purpose, and *for facilitating a settlement of the whole controversy over such losses* as are comprehended within it, and that all the ease with which rights can be adjusted in equity is intended to be given to the proceeding. *It is the administration of equity in an admiralty court.* Dowdell v. United States District Court [9 Cir.,] 139 F. 444, 445. The proceeding partakes in a way of the features of a bill to enjoin a multiplicity of suits, a bill in the nature of an interpleader, and a creditor's bill. *It looks to a complete and just disposition of a many-cornered controversy,* and is applicable to proceedings *in rem* against the ship as well as to proceedings *in personam* against the owner, the limitation extending to the owner's property as

well as to his person. The City of Norwich, 118 U.S. 468, 503 [6 S.Ct. 1150, 30 L.Ed. 134]." (emphasis supplied).

In Just v. Chambers, 312 U.S. 383, 61 S.Ct. 687, 85 L.Ed. 903 (1941), it was held that "[w]hen the jurisdiction of the court in admiralty has attached through a petition for limitation, . . ." it "acquires the right to marshal all claims, whether of strictly admiralty origin or not, and to give effect to them by the apportionment of the *res.* . . ." 312 U.S. 386, 61 S.Ct. 690.

The holding stated was prefaced by this statement (pp. 385–386, 61 S.Ct. p. 690):

"The statutory provision for limitation of liability, enacted in the light of the maritime law of modern Europe and of legislation in England, has been broadly and liberally construed in order to achieve its purpose to encourage investments in shipbuilding and to afford an opportunity for the determination of claims against the vessel and its owner. Norwich [and New York Transp.] Company v. Wright, 13 Wall. 104, 121 [20 L.Ed. 585]. *It looks to a complete disposition of what may be a 'many cornered controversy,'* thus applying to proceedings *in rem* against the ship as well as to proceedings *in personam* against the owner, the limitation extending to the owner's property as well as to his person. The City of Norwich, 118 U.S. 468, 503 [6 S.Ct. 1150, 30 L.Ed. 134]; Hartford Accident [& Indemnity] Co. v. Southern Pacific Co., 273 U.S. 207, 216 [47 S.Ct. 357, 71 L.Ed. 612]. It applies to cases of personal injury and death as well as to cases of injury to property. Butler v. Boston Steamship

Co., 130 U.S. 527, 552 [9 S.Ct. 612, 32 L.Ed. 1017]; The Albert Dumois, 177 U.S. 240, 259 [20 S.Ct. 595, 44 L.Ed. 751]. The limitation extends to tort claims even when the tort is non-maritime. Richardson v. Harmon, 222 U. S. 96 [32 S.Ct. 27, 56 L.Ed. 110]." (emphasis supplied).

■ The exclusive jurisdiction of an admiralty court in a multiple-claims-inadequate-fund limitation proceeding is of such dimension that an Admiralty Court cannot grant permission to a claimant to establish his claim in another tribunal. Pershing Auto Rentals, Inc. v. Gaffney, 279 F.2d 546 (5 Cir. 1960). (In the instant case there were multiple claims aggregating $1,700,000.00 and the $1,150,000.00 settlement was inadequate to satisfy them).

The Supplemental Rules, F.R.C.P.,[3] applicable to actions for exoneration from or limitation of liability, evidence, in Rule F(8), the exclusive jurisdiction of the Admiralty Court with respect to disposition of claims presented in such actions.

Rule F(8),[4] captioned "Objections to Claims: Distribution of Fund" provides that the Admiralty Court "shall" divide "the fund deposited or secured" "among the several claimants," and "[a]ny interested party may question or controvert any claim without filing an objection thereto." The latter provision would permit the Reading Company to present to the Admiralty Court the objections which it raised in the Reorganization Court with respect to PRR's right to resort to the settlement fund for reimbursement of the $370,241.47 it had advanced to Long Branch in Central's behalf. Thus, independent of all else, there was no reason, or justification, for

3. The Supplemental Rules, effective July 1, 1966, are the successors to the former General Admiralty Rules, rescinded the same date.

4. Rule F(8) reads as follows:
"Any interested party may question or controvert any claim without filing an objection thereto. Upon determination of liability the fund deposited or

secured, or the proceeds of the vessel and pending freight, shall be divided pro rata, subject to all relevant provisions of law, among the several claimants in proportion to the amounts of their respective claims, duly proved, *saving, however, to all parties any priority to which they may be legally entitled.*" (emphasis supplied).

the Reorganization Court's consideration of Reading's objections.

█ It is clear from what has been said that the Admiralty Court has exclusive jurisdiction in the instant case with respect to the distribution of the proceeds of the settlement of the limitation proceeding now in its Registry, and that the Reorganization Court was accordingly without jurisdiction to adjudicate rights of claimants to the *res* in the Registry, as it did in its Memorandum and in its October 13, 1970 Order No. 368.

It must be noted parenthetically that the Admiralty Court in its "Final Judgment and Final Injunction," entered in the limitation proceeding on September 5, 1969—more than a year prior to the filing of Order No. 368—specifically provided that the *res* in its Registry was *"subject to the further order of this Court regarding distribution of the monies represented by said security* [*res*].*"*

It must further be observed that the Reorganization Court did not take note, in its Memorandum, of the recited provision in the Admiralty Court's September 5, 1969 judgment, nor did it discuss the question of its own jurisdiction with respect to the distribution of the *res* in the Admiralty Court Registry.

In accordance with what has been said the holding of the Reorganization Court, in its Memorandum, that PRR is not entitled to distribution from the Registry of the $370,241.47 it advanced to Long Branch in Central's behalf, must be reversed for lack of jurisdiction, and the Court's Order No. 368, which gave effect to the stated holding, must be vacated.

█ Although it is not critical, or essential, to our stated disposition, this, too, must be said with respect to the appellants' challenge to the Reorganization Court's holding that PRR was not entitled to distribution from the Registry of the $370,241.47 it advanced to Long Branch in Central's behalf:

As earlier stated, the genesis of this holding was the Reorganization Court's view that Central had "assumed an overriding obligation to repay the advances made on its behalf by PRR," in letters of agreement exchanged between PRR and Central.

The letters of agreement do not afford an iota of nourishment to the Reorganization Court's stated construction. To the contrary, they establish that both PRR and Central looked to the proceeds of the limitation proceeding, or an independent suit against Grace Line, *"to repay the special advances made by Pennsylvania in connection with this accident, advances made by Pennsylvania for Central Railroad of New Jersey being included."* (emphasis supplied).[5]

As the Reorganization Court said in its Memorandum, "[t]he letters of agreement between PRR and the Debtor [Central] clearly expressed their understanding of the transaction which was the subject matter thereof"; viz., PRR's advances to Long Branch in its own and Central's behalf.

There were three letters in all: June 17, 1966, June 23, 1966 and July 18, 1966.

On June 17, 1966, PRR by letter, advised Central, *inter alia*, that it would advance to Long Branch Central's share of the emergency expenses flowing from the drawbridge accident on these conditions: (1) Central was to pay PRR 6% interest on advances to Long Branch made in its behalf; (2) "[a]ll proceeds received by way of insurance or suit will be used to repay our advances and our advances on your behalf"; (3) "[u]ntil any deficiencies in the repayment of advances made by us either for ourselves or for you are eliminated, the proceeds from the sale of real estate or other sources will be applied to these advances"; (4) "[t]o the extent there is an overage accruing out of this accident regardless of source and regardless of

---

5. Central's letter of June 23, 1966 to PRR.

whether it is received by the New York and Long Branch, Central Railroad of New Jersey or Pennsylvania, this shall be divided up as an offset against the expense of the Central Railroad of New Jersey and Pennsylvania on a percentage basis and proportioned to the agreed upon expense incurred by each railroad"; and (5) "New York and Long Branch costs for this accident to the extent they should be properly capitalized will be handled on a 50-50 basis and to the extent that they are expense items they will be split on the customary 57%–43% basis."

On June 23, 1966, Central wrote PRR in reply to its June 17, 1966 letter, agreeing in substance to PRR's terms "with respect to the problem of advances to the New York and Long Branch," but

6. Central's June 23, 1966 letter to PRR stated:
"Thank you for yours of June 17th with respect to the problem of advances to the New York and Long Branch. I am purposely replying to you on Central Railroad of New Jersey letterhead as I think the commitment primarily relates to the Central Railroad of New Jersey rather than New York and Long Branch.
"To have no misunderstanding with respect to the two railroads, I would restate your five points as follows:
"(1) To the extent that amounts are advanced by Pennsylvania Railroad on behalf of the Central Railroad of New Jersey's obligation to participate in necessary advances to the New York and Long Branch to meet extraordinary expenses because of the Raritan River Drawbridge accident on March 3rd, the Pennsylvania will charge Central Railroad of New Jersey interest at 6%. This will be applicable to whatever such advances on behalf of Central Railroad of New Jersey may be, regardless of whether the need for the money is for capital or expense items.
"(2) All proceeds received by the New York and Long Branch by way of insurance or suit will be used to repay the special advances made by Pennsylvania in connection with this accident, advances made by Pennsylvania for Central Railroad of New Jersey being included.
"(3) Until all deficiencies in the repayment of advances to the New York and Long Branch, in connection with this accident, made by the Pennsylvania on be-

restating them so as "[t]o have no misunderstanding." The June 23rd letter, set forth in the margin,6 specifically provided as follows with respect to the repayment of any and all of PRR's advances to Long Branch:

"(2) *All proceeds received by the New York and Long Branch by way of insurance or suit will be used to repay the special advances made by Pennsylvania in connection with this accident, advances made by Pennsylvania for Central Railroad of New Jersey being included.*" (emphasis supplied).

On July 18, 1966, PRR wrote to Central in relevant part as follows:

"Your letter of June 23 satisfactorily sets forth my understanding of the

half of itself or Central Railroad of New Jersey, have been eliminated the proceeds from the sale of New York and Long Branch real estate or any other unusual source of funds to the New York and Long Branch, will be applied to the satisfying of these advances.
"(4) To the extent that the recovery of costs from this accident exceed the complete satisfaction of advances made directly to the New York and Long Branch, such recovery will be apportioned to the Pennsylvania and the Central Railroad of New Jersey in the ratio of the costs resulting from this accident which each of these railroads had separately.
"(5) With respect to necessary advances to the New York and Long Branch because of this accident it is understood that advances covering capital items are a responsibility on a 50/50 basis as between Pennsylvania and Central Railroad of New Jersey, but if they are expense items the advances will be considered as being on the customary basis of 57% Pennsylvania and 43% Central Railroad of New Jersey.
"In the above I have not intentionally changed our commitment nor have I done other, I hope, than clarify to avoid any possible misunderstanding of the points covered in your June 17th letter. It is entirely agreeable to me to have this letter represent an expression of Central Railroad of New Jersey responsibility but if you prefer to have a more formal agreement prepared by your Law Department, that is likewise acceptable to us."

terms under which The Pennsylvania Railroad Company has committed itself *to advance funds to The New York and Long Branch Railroad Company* in connection with restoration of the Raritan River bridge." (emphasis supplied).

Our stated view that the Reorganization Court erred in its construction of the letters of agreement renders unnecessary consideration of the rulings of the Court with respect to the impact of the New Jersey Uniform Commercial Code in this case.

These observations are in order:

The Reorganization Court disregarded these undisputed facts: Long Branch is the claimant in the Admiralty Court for the $740,482.95 damages incurred by it as a result of the drawbridge accident, and it alone can be compensated by the admiralty Registry for its damages outlay; the circumstance that on its recovery from the Registry of its damage expenses Long Branch will repay to PRR the advances it made to finance such expenses is irrelevant to any PRR–Central status as to these advances.

The result reached by the Reorganization Court would grant a "windfall" to the bankrupt Central of the $370,241, advanced by PRR to Long Branch in Central's behalf, at the expense of the bankrupt Penn Central, PRR's successor. Such a result cannot by any stretch of the imagination be termed equitable and it does violence to the traditional concept of a bankruptcy court as a court of equity.

For the reasons stated the disposition made by the Reorganization Court in its Memorandum will be reversed, and its Order No. 368 will be vacated, and the cause remanded with directions to proceed in accordance with this opinion.

ADAMS, Circuit Judge (concurring and dissenting).

Reconciling the extensive jurisdiction of an admiralty court with the even broader jurisdiction of a reorganization court, is the task confronting the Court in this appeal. The majority, focusing on the Admiralty proceedings, holds that the Reorganization Court was without jurisdiction to issue the order herein appealed from. I respectfully disagree, for I believe that an examination of the history and purposes of admiralty and bankruptcy jurisdiction reveals that the two are compatible in this case.

I

To understand how this seeming conflict arose, the course of two district court proceedings must be traced. The Admiralty Court action was the result of the ramming and damaging, on March 3, 1966, of a railroad drawbridge which spanned the Raritan River in New Jersey, by the Steamship *Santa Isabel*, owned by the Grace Line.

On April 12, 1966, the Grace Line filed, pursuant to 46 U.S.C. § 183, a petition for exoneration from, or limitation of, liability in the United States District Court for the Southern District of New York.[1] The owner of the dam-

---

1. Venue in limitation of liability proceedings is as follows:

    "The complaint shall be filed in any district in which the vessel has been attached or arrested to answer for any claim with respect to which the plaintiff seeks to limit liability; or, if the vessel has not been attached or arrested, then in any district in which the owner has been sued with respect to any such claim. When the vessel has not been attached or arrested to answer the matters aforesaid, and suit has not been commenced against the owner, the proceedings may be had in the district

    in which the vessel may be, but if the vessel is not within any district and no suit has been commenced in any district, then the complaint may be filed in any district." Supplementary Rule F(9), F.R.Civ.P.

    Under these provisions, any number of district courts might have become the forum in which the claim involved here could be adjudicated. For example, had the *Santa Isabel* been outbound on a voyage and able to continue to its next port, possibly Seattle, the reasoning of the majority might conceivably suggest that the United States · District Court for the

aged bridge, the New York and Long Branch Railroad Company (Long Branch) answered Grace's petition. The Long Branch is owned in equal shares by the Pennsylvania Railroad (PRR)[2] and the Central Railroad of New Jersey (Central),[3] which jointly use its 39.6 mile right-of-way. A single claim was filed by the three railroads in Admiralty Court, alleging the following damages: Long Branch, $900,000. for repair of the drawbridge and the cost of substituted bus service; Central, $500,000. for consequential damages; and PRR, $300,000. for consequential damages. Thus, the Admiralty Court faced a case involving typical questions of a maritime tort, negligence, damages, and the extent of the shipowner's liability. The Admiralty Court did not address the problem of the division of the proceeds among the claimant railroads.

On March 23, 1967, the Central filed a petition for reorganization under the Railroad Reorganization Act, 11 U.S.C. § 205, in the District Court of New Jersey. Prior to this filing, the following events had transpired relative to the bridge accident: The PRR and the Central operated over the rails of the Long Branch pursuant to a 999 year lease agreement. This lease agreement required the PRR and the Central to advance to Long Branch, in equal amounts, funds necessary to meet emergencies. The Central, approaching a dire cash shortage, asked the PRR to advance Central's share to Long Branch as well as its own, or in effect, to lay out the entire cost of repairing the bridge. The PRR agreed to do so,[4] and by doing so became a creditor of the Central. When the Central filed its petition in

bankruptcy, it listed as a liability the advance that had been made by the PRR to the Long Branch on behalf of the Central. Central had, as a potentially realizable asset, its claim against Grace for consequential damages. Further, under certain circumstances, Central arguably, could have had a claim to one-half of the recovery for the damage to the bridge. This second asset represented the recovery contemplated by the Long Branch, one-half of which might be expected to flow through to the Central as the 50% owner of the Long Branch. The assets and liabilities of a debtor are the primary concern of a reorganization court.

Late in 1968, a settlement of the admiralty claim was proposed. The agreement, *inter alia,* restricted the liability of Grace to $1,150,000.[5] The limitation portion of the agreement clearly was responsive to the admiralty-related questions, and the presently-appealed-from order of the Reorganization Court did not disturb this aspect of the agreement. The agreement went on, however, to include a "formula for distribution of the Grace Line settlement," apportioning the proceeds between the PRR and the Central.

The formula did not present an issue arising directly from the the maritime accident, but rather a problem of realization of assets and payment of liabilities, a matter directly and traditionally within the province of a reorganization court. The proposed formula divided the fund to be awarded between the PRR, which was to receive $834,251.02, and the Central, which was to receive $205,748.98. Significantly, none of the money was allocated to the Long Branch.

Western District of Washington might be the appropriate forum to adjudicate the dispute among the three railroads. Then that Court would have to examine the reorganization program of at least two trustees to resolve their dispute.

2. The PRR has gone through several metamorphoses since the accident and appears in the present case as Trustees of the property of the Penn Central Transportation Company.

3. As will be discussed *infra,* the Central is undergoing reorganization pursuant to § 77b of the Bankruptcy Act, 11 U.S.C. § 205, and it is here appearing by its trustees.

4. There is considerable contention over the status to be accorded this agreement.

5. It was stipulated by all parties that a counsel fee of $110,000 was to be paid from these proceeds.

The trustees of the Central, in order to join in the proposed settlement, had to submit the proposal to the Reorganization Court for approval. The Reorganization Court approved the trustees' participation in the settlement of the maritime question but refused to allow the "formula" to be accepted. Instead, the Reorganization Court instructed the Central to agree only if there were a reallocation of the proceeds.

Appellants, trustees of the Penn Central (successor in interest to PRR), contend, and the majority holds, that in defining an allocation to which the Central could agree, the Reorganization Court impermissibly encroached upon the jurisdiction of the Admiralty Court. Looking to the questions presented to each Court, the special nature of each Court and the purposes of the jurisdiction granted these Courts, I must dissent from that portion of the majority's opinion which holds that the Reorganization Court had no jurisdiction to determine the allocation of the amount which the Admiralty Court held was sufficient to discharge Grace from all liability.

## II

The majority maintains that the jurisdiction of the Admiralty Court extends to determining how much the tort-feasor must pay to limit liability and the division of the available funds among the claimants. Under normal circumstances this would be a proper role for an admiralty court. However, when essentially only one claim is made, and that claim is to be divided among several parties, at least one of which is undergoing court-supervised reorganization, normal circumstances are not present. This is because the reorganization court, too, has a broad mandate to supervise the actions of the debtor.

Thus, the dilemma is posed, two congressional mandates in apparent conflict. One horn of this dilemma is the congressional directive that a reorganization court is to have "exclusive jurisdiction of the debtor and its property wherever located." The other is Rule F(8) of the Supplemental Rules,[6] F.R.Civ.P. This Rule provides that conflicting claims among claimants are to be resolved in the admiralty proceedings:

"Objections to Claims: Distribution of Fund. Any interested party may question or controvert any claim without filing an objection thereto. Upon determination of liability the fund deposited or secured, or the proceeds of the vessel and pending freight, shall be divided pro rata, subject to all relevant provisions of law, among the several claimants in proportion to the amounts of their respective claims, duly proved, saving, however, to all parties any priority to which they may be legally entitled."

Our task then, as so often the case with the judiciary, is to reconcile two concepts, in order to permit each to serve its purpose. To discharge this responsibility it is the duty of the Court to interpret the statutes and rules pursuant thereto harmoniously, following each Congressional directive to the greatest extent possible, not disposing of the seeming conflict by resort to a mechanical rule but by ascertaining the policies underlying each enactment. The United States Supreme Court, in Boys Markets, Inc. v. Retail Clerk's Union, Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970) faced the problem of making congruent two seemingly contradicting statutes. Mr. Justice Brennan, speaking for the Court, stated the approach to be followed:

"Statutory interpretation requires more than concentration upon isolated words; rather, consideration must be given to the total corpus of pertinent law and the policies that inspired ostensibly inconsistent provisions." 398 U.S. at 250, 90 S.Ct. at 1592.

Examining the purposes of each statute here, I believe that such a symbiosis is possible.

6. The Supplemental Rules, guiding the procedure in Admiralty, replaced the General Admiralty Rules in 1966.

The majority has stated, "once an Admiralty Court acquired jurisdiction in a limitation of liability proceeding, its jurisdiction is exclusive of all other forums, where the amount of the claims exceeds the value of the vessel and its freight." Examination of the cases on which the majority principally relies to support this proposition reveals a factual background common to all, underlying and underscoring the purposes and utility of a limitation of liability proceeding and the jurisdiction of the admiralty court granted by Rule F(8).

The factual pattern of an archetypal limitation of liability proceeding is a steamship collision or fire, killing or injuring passengers and crew, destroying baggage and cargo.

The major purpose of this 1851 Congressional program permitting limitation of liability was to assist the American maritime industry:

"[T]he great object of the statute was to encourage shipbuilding and to induce the investment of money in this branch of industry by limiting the venture of those who build the ships to the loss of the ship itself or her freight then pending." Hartford Accident & Indemnity Co. v. Southern Pacific Co., 273 U.S. 207, 214, 47 S.Ct. 357, 358, 71 L.Ed. 612 (1927).

Thus, the statute and rule are for the benefit of the shipowner, in the present case Grace Line. Any impact the statute might have on the claimants, PRR and Central, is secondary.

To effectuate the Congressional scheme it was required that all those suffering a loss because of the maritime accident present their individual claims in a central forum, the admiralty court. That court was then to adjudicate the classic maritime tort questions of negligence, damages, the extent of the fund available to be apportioned among the successful claimants and, unless unusual circumstances pertain, the proper apportionment. Such a single proceeding is clearly necessary for the limitation of liability. It avoids a multiplicity of suits with potentially inconsistent findings; it prevents awards being made without an appreciation of the extent of other claims; it is economical of the litigants' and the court's time.

The cases cited and quoted by the majority raise only procedural variations from the common fact pattern, thus confirming that the central concern is to secure consistency in the decision of the maritime issues arising from a single accident.

Providence & New York Steamship Co. v. Hill Manufacturing Co., 109 U.S. 578, 3 S.Ct. 379, 617, 27 L.Ed. 1038 (1883), arose when the steamer *Oceanus,* a coastal freighter, burned in New York harbor, destroying the cargo of many different manufacturers. Hill, one of those manufacturers, sought to have the question of negligence and damages tried in a Massachusetts state court. In this context the United States Supreme Court held that Hill's claim could be adjudicated only in the limitation of liability proceeding.

The explosion of the oil barge *Bolikow* was the operative incident in Hartford Accident & Indemnity Co. v. Southern Pacific Co., 273 U.S. 207, 47 S.Ct. 357, 71 L.Ed. 612 (1927). That explosion damaged the Southern Pacific's steamer *El Occidente* as well as killing and injuring crewmen. Though the actual issue before the Supreme Court was the status of the limitation proceeding after a finding of privity,[7] the only issues before the admiralty court were typical maritime tort questions.

In Maryland Casualty Co. v. Cushing, 347 U.S. 409, 74 S.Ct. 608, 98 L.Ed. 806 (1954), five seamen were killed when

7. For an owner or charterer of a ship to avail himself of the benefits of limited liability, the owner or charterer must show that the accident occurred without his privity or knowledge. 46 U.S.C.A. §§ 183 & 185.

the towboat *Jane Smith* struck a pier and capsized. Although the shipowners had begun a limitation of liability proceeding, representatives of the five seamen, attempting to avail themselves of the Louisiana direct action statute, sued the boat's insurer in state court. Justice Frankfurter, announcing the judgment of the Court, in an opinion joined by three other Justices, stated that the seamen could not proceed in state court. He found that a multiplicity of suits based on the same facts, raising the same maritime questions, would be contrary to the Congressional scheme.[8]

The present case is very different from those cited by the majority. Here the problem is not one of a potential multiplicity of suits; there is but one claim made by the three railroads. Nor is the problem before the Reorganization Court one necessarily involved in the resolution of the maritime dispute. The purposes of the admiralty court's jurisdiction, to allow a single forum to resolve common questions in a multiple-claimant situation, is not thwarted by the action of the Reorganization Court. Though under usual circumstances, resolution of the dispute over the proceeds among the three railroads might well be done in the admiralty court, the purposes and the broad mandate of the Reorganization Court require that, under the special facts here, such Court determine these *inter sese* claims.

### III

The broad jurisdiction of the admiralty court is not directed fundamentally towards enabling that court to resolve a conflict among inter-related claimants. However, a reorganization court is charged with sorting out just such complex intercorporate problems.

The purpose undergirding Chapter X of the Bankruptcy Act, 11 U.S.C. § 501 et seq., the Corporate Reorganization Statute, and § 77, the Railroad Reorganization Act, 11 U.S.C. § 205, is to have a court carry out an efficient and equitable adjustment, making the debtor sound, yet respecting to the greatest extent possible the right of creditors. *See* 6 Collier on Bankruptcy ¶ 0.01, p. 2 (14th ed.). To secure this goal Congress has vested extensive power in reorganization courts, granting them "exclusive jurisdiction of the debtor and its property wherever located." 11 U.S.C. §§ 205(a), 511.

This Court, in carrying out the Congressional design, has stated that such grant of power is to be broadly interpreted.

"Bankruptcy proceedings are inherently proceedings in equity. Reorganization proceedings under the Bankruptcy Act are 'special' proceedings which seek only to bring about a reorganization. The tendency of judicial interpretation of the Act has been in the direction of progressive liberalization in respect of the operation of the bankruptcy power so as to meet the challenge of present day economic and business conditions." In re International Power Securities Corp., 170 F. 2d 399, 402 (3d Cir. 1948).

Concepts of property, title and the like are to be treated flexibly to achieve the purpose of the Act. In the Matter of Imperial "400" National, Inc., 429 F. 2d 671, 677 (3d Cir. 1970).[9]

8. The majority cites Pershing Auto Rentals, Inc. v. Gaffney, 279 F.2d 546 (5th Cir. 1960), stating that it holds that, "The exclusive jurisdiction of an admiralty court in a multiple-claims-inadequate-fund limitation proceeding is of such dimension that an Admiralty Court cannot grant permission to a claimant to establish his claim in another tribunal." This statement itself indicates the misapprehension of the

role of an admiralty court for in the Central's case there is no question of establishing a claim in another court. The claim has been established in Admiralty. The Reorganization Court is addressing the question of the right to the proceeds of that claim.

9. In a printer's error the Federal Reporter 2d Series report dropped several lines of

Both *International Power Securities* and *Imperial "400"* involved Chapter X proceedings, normal corporate reorganizations. As has been recently pointed out by this Court, in a *railroad reorganization* the public interest in the survival of the enterprise is greater, thus requiring that the railroad reorganization statute be even more liberally construed. In the Matter of the Penn Central Transportation Company, 453 F.2d 520 (3d Cir.) cert. denied, Central Penn National Bank v. Trustees of Property of Penn Central Transp. Co., 408 U.S. 923, 92 S.Ct. 2493, 33 L.Ed.2d 334 (1972).

The broad grant of jurisdiction to reorganization courts, expansively interpreted, gives them power to administer the property of the debtor, be it in the actual possession of the debtor railroad, in the physical possession of another not held by the possessor under a substantial claim of right, or property that by its nature cannot be physically possessed by another. In re Lehigh Valley R. Co., 458 F.2d 1041, 1043 (3d Cir. 1972).

A pending lawsuit instituted by a debtor before entering reorganization is property encompassed by this definition. In Meyer v. Fleming, 327 U.S. 161, 66 S.Ct. 382, 90 L.Ed. 595 (1946), the Supreme Court, dealing with a more complex problem [10] than the present one, stated the following rule for reorganization proceedings:

"Litigation instituted by a creditor may not be defeated merely by reason of the fact that he has become a bankrupt. Thatcher v. Rockwell, 105 U.S. 467, 469–470 [26 L.Ed. 949]. Title to

the claim vests, of course, in the bankruptcy trustee. He is in position to take control of the litigation." 327 U.S. at 165, 66 S.Ct. at 385.

There can be no doubt that the claim in the Admiralty Court filed by the Central is its property and is controlled by its trustees who are responsible to the Reorganization Court. A compromise of the admiralty claim is a disposition of the debtor's property and the supervision and adjudication of such property is directly within the purposes served by the Reorganization Court's broad jurisdiction.

In *Imperial "400,"* supra, this Court affirmed the action of a reorganization court enjoining further proceedings in another bankruptcy action involving an enterprise in which *Imperial* was a 50% partner. Upholding the injunction this Court stated:

"A prime consideration in determining whether a court may interfere with another proceeding which will affect the reorganization of the debtor, is the general policy of the reorganization statute: 'that the entire administration of an estate should be centralized in a single reorganization court.' Duggan v. Sansberry, 327 U. S. 499, 511, 66 S.Ct. 657, 90 L.Ed. 809 (1946). *See* also In re Cuyahoga Finance Co., 136 F.2d 18, 21 (6th Cir. 1943). It is true, . . . that 'Congress did not give the bankruptcy court exclusive jurisdiction over all controversies that in some way affect the debtor's estate.' Callaway v. Benton, 336 U.S. 132, 142 [69 S.Ct. 435, 93

the opinion, 429 F.2d at 677, n. 8. The full paragraph should correctly read:

"In order to effectuate the purpose of Chapter X proceedings—'to render the authority and control of the reorganization tribunal paramount and all-embracing to the extent required to achieve the ends contemplated by Chapter X; and to exclude any interference by the acts of others or by proceedings in other courts where such activities or proceedings tend to hinder the progress of reorganization' [6 Collier on Bankruptcy ¶ 3.03, p. 424 (14th Ed.)]—this

Court has indicated that traditional concepts of property, title and separate entities may have to give way. In re Pittsburgh Rys. Co., 3 Cir., 155 F.2d 477 at 485; New York Trust Company v. Greenwood Lake Ry. Co., 3 Cir., 156 F.2d 701, at 704.
Slip opinion at 9.

10. Meyer v. Fleming, *supra*, dealt with the possession of the right to continue or terminate a derivative suit after the corporation, in whose name the suit had been brought, filed for reorganization.

L.Ed. 553] (1949); In re South Jersey Land Corp., 361 F.2d 610 (3d Cir. 1966). But, a 'reorganization court can and should enjoin the prosecution of any suit which would take from it the decision of any question which it has the duty to decide in connection with the reorganization or which would hamper it in any way in exercising the power imposed upon it by Chapter X.' First National Bank in Houston, Texas v. Lake, 199 F.2d 524, 528 (4th Cir.), cert. denied, 344 U.S. 914 [73 S.Ct. 337, 97 L.Ed. 705] (1952)." 429 F.2d at 677.

Based on these principles it is clear that the Reorganization Court did not err in issuing directions to the Central trustees regarding the sum in the registry of the Admiralty Court.

The Congressional purpose in granting extensive jurisdiction to an admiralty court is in no way served by the majority's conclusion that an admiralty court must, alone, resolve the controversy among the claimants. Yet, removing Central's claim from the supervision of the Reorganization Court would defeat the purpose of that Court's broad jurisdiction.[11] For this reason, the seeming conflict of jurisdiction should be resolved—at least on the basis of the facts here—in favor of the Reorganization Court.[12]

Although, as they acknowledge, the majority's discussion of the PRR's entitlement to a distribution of the funds generated by Grace's proffer of settlement is dicta, nevertheless the conclusion they reach concerning the distribution of the funds would appear to have much merit.

Therefore, I would reverse and remand for proceedings consistent with such analysis.

---

[11.] This result does not in any way encroach upon the primary functions of the Admiralty Court to decide the question of negligence, and to delimit the shipowner's liability. Certainly the shipowner, in this type situation, with the maritime questions resolved, would have no interest in the priorities to be assigned to those asserting claims.

[12.] It might be claimed that there is an advantage to the majority's approach in that it creates a degree of certainty. But certainty in such matters may well be an illusion. The complexities facing the judiciary in the dynamic world of court-supervised reorganization cannot be solved by unreal simplicities of law.