In the Matter of: In re: TUG ALLIE–B, INC., a corporation, as owner of the tug ALLIE B, a commercial tug boat, official document number 524008 and Dann Ocean Towing, Inc., as operator of said vessel, in a cause of action for exoneration from or limitation of liability,

No. 8:98–CV–2671–T–23B.

United States District Court, M.D. Florida, Tampa Division.

Sept. 8, 2000.

Robert B. Parrish, Phillip Arthur Buhler, Moseley, Warren, Prichard & Parrish, Jacksonville, FL, for Tug Allie–B, Inc., and Dann Ocean Towing, plaintiffs.

Michelle T. Delemarre, U.S. Dept. of Justice, Torts Branch, Civil Division, Robert A. Kaplan, U.S. Dept. of Justice, Environmental Enforcement Section, Environment and Natural, Resource Division, Washington, DC, for U.S., claimant.

David W. McCreadie, Lau, Lane, Pieper, Conley & McCreadie, P.A., Tampa, FL, Eugene J. O'Connor, Jr., Freehill, Hogan & Mahar, LLP, New York, NY, for United States of America, Allied Towing Corp., claimant.

### ORDER

MERRYDAY, District Judge.

This action arises from the July 19, 1998, grounding of the tug ALLIE–B and her tow, barge ATC 350, which occurred

near Ledbury Reef in Biscayne National Park (the "Park"). The Park extends approximately twenty-six miles, north to south, from the tip of Key Biscayne to Key Largo, Florida, and is home to a rare combination of terrestrial, marine, and amphibious life. The ALLIE–B mishap resulted in severe damage (estimated in excess of $3 million) to certain of the Park's natural resources.[1]

Following the grounding of the ALLIE–B, her owners and operators (collectively, the "vessel owners") filed this action pursuant to the Limitation of Vessel Owner's Liability Act of 1851 ("Limitation Act"), 46 U.S.C.App. § 181, *et seq.*,[2] seeking exoneration from liability or, alternatively, a determination by the Court that any liability attributable to the petitioners is properly limited to the post-accident value of the ALLIE–B and her freight.[3] In their complaint the vessel owners ask the Court to enjoin all potential claimants from filing claims outside this limitation action for damages arising from the ALLIE–B grounding incident. In essence, the United States asks that the Court decline to enjoin the United States (which injunction is typically a perfunctory consequence of a limitation action) from filing against the vessel owners a separate action based on the Park System Resource Protection Act (PSRPA), to which, the United States argues, the Limitation Act is subordinate.[4] Whether the Limitation Act insulates a vessel owner against liability otherwise arising under the PSRPA is apparently an issue of first impression.[5]

Congress enacted the Limitation Act in 1851, in an effort to promote America's fledgling shipping industry. More specifically, Congress sought to secure equivalency for the United States with Great Britain by limiting American vessel owners' economic exposure with respect to maritime accidents that occurred without the own-

---

1. The United States describes and summarizes the damage as follows: "(a) craters (blow holes) and associated coral debris rubble berms, created by the wash of the tug ALLIE–B's propellers, as the tug ALLIE–B attempted to power herself and barge ATC 350 off the reef; and (b) tow cable scrapings, scars, and abrasions to both corals and reef framework; and (c) crushing, fracturing, and dislodgement of both corals and reef framework caused by the impact of the ALLIE–B contacting the reef; and (d) shearing of reef buttresses, toppling of large reef boulders, fracturing and shattering of reef framework, and the crushing and displacement of numerous living corals and other fauna, caused by the impact of the barge contacting the reef" (Doc. 12, p. 4).

2. Section 183(a) states that:
   The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not, except in the cases provided for in subsection (b) of this section, exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.

3. The vessel owners estimate the post-accident value of the ALLIE–B and her freight at $1.3 million.

4. The United States styled its motion as a "Motion to Lift Any Injunction Entered Pursuant to the Limitation of Liability Act and for an Order that the Limitation Act does not Apply to the United States' Park System Resource Protection Act Claims" (Doc. 12). Actually, no specific injunction was entered, and the parties are unclear as to the status quo. If an injunction is automatic in this case, the parties agree that the United States' motion seeks dissolution of the injunction. If no injunction is presently effective, the parties agree that the United States' motion asks the Court to decline or refuse to enjoin. In either event, the parties seek prompt appellate review of this order pursuant to 28 U.S.C. § 1292(a). Accordingly this order is either a dissolution of an injunction or a declination to enjoin, as the case may be, and properly appealable in either instance.

5. Neither the United States nor the vessel owners identify for the Court any previous decision that addresses the PSRPA or the interpretation of any of its provisions. Nor has the Court, as a result of its own inquiry, located any precedent on point.

ers' "privity or knowledge." *See Universi-ty of Texas Medical Branch at Galveston v. United States,* 557 F.2d 438, 454 (5th Cir.1977) (citing 23 Cong.Globe, 31st Cong., 2d Sess. 714 (Remarks of Sen. Davis, Feb. 26, 1851)). Pursuant to the Limitation Act, the liability of a vessel owner "for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture" is limited to the post-accident value of the vessel and pending freight.[6]

About one hundred forty years after passing the Limitation Act, Congress enacted the PSRPA, 16 U.S.C. § 19jj, *et seq.* As stated in Senate Report No. 1010–328, June 8, 1990, the PSRPA's purpose is (1) to enable the United States to initiate legal action against individuals who damage or destroy marine resources within the National Park System and (2) to allow the United States to preserve and dedicate all funds recovered under the PSRPA to the prompt restoration and replacement of the resources without the requirement of an annual congressional appropriation.[7]

The PSRPA provides both for *in personam* and *in rem* liability and authorizes the award of "response costs"[8] and "damages"[9] against any person or instrumen-tality that "destroys, causes the loss of, or injures any park system resource."[10] *See* 16 U.S.C. § 19jj–1 (a) and (b). The Act's otherwise pervasive liability is expressly limited only by the following section, entitled "Defenses":

> A person is not liable under this section' if such person can establish that-
>
> (1) the destruction, loss of, or injury to the park system resource was caused solely by an act of God or an act of war;
>
> (2) such person acted with due care, and the destruction, loss of, or injury to the park system resource was caused solely by an act or omission of a third party, other than an employee or agent of such person; or
>
> (3) the destruction, loss, or injury to the park system resource was caused by an activity authorized by Federal or State law.

16 U.S.C. § 19jj–1(c). The United States contends that these defenses are exclusive and that the statute permits no defenses, including a defense arising from the Limitation Act, other than those statutorily specified.

While the text of the PSRPA includes no specific defense premised on the Limitation Act, neither does the statute expressly

---

**6.** This limitation is available only if the act or damage occurred without the privity or knowledge of the vessel's owner. 46 U.S.C.App. § 183. "For his own fault, neglect, and contracts, the owner remains liable." *Hines, Inc. v. United States,* 551 F.2d 717, 722 (6th Cir.1977) (citing *American Car & Foundry Co. v. Brassert,* 289 U.S. 261, 264, 53 S.Ct. 618, 77 L.Ed. 1162 (1933)).

**7.** The PSRPA was enacted, at least partially, in response to two grounding incidents (one of which occurred in Biscayne National Park in 1986), which resulted in catastrophic damage to coral reefs owned by the United States. Much of the damage remained unrepaired because of insufficient or unavailable funds. *See* Senate Report No. 1010–328, June 8, 1990, pp. 3–4.

**8.** "Response costs" are defined by the Act as "the costs of actions taken by the Secretary of the Interior to prevent or minimize destruction or loss of or injury to park system resources; or to abate or minimize the immi-nent risk of such destruction, loss or injury; or to monitor ongoing effects of incidents causing such destruction, loss, or injury." 16 U.S.C. § 19jj(c).

**9.** "Damages" are defined by the Act to include compensation for the following: "(A)(i) the cost of replacing, restoring, or acquiring the equivalent of a park system resource; and (ii) the value of any significant loss of use of a park system resource pending its restoration or replacement or the acquisition of an equivalent resource; or (B) the value of the park system resource in the event the resource cannot be replaced or restored." 16 U.S.C. § 19jj(b).

**10.** A "park system resource" is defined by the PSRPA as "any living or nonliving resource that is located within or is a living part of a marine regimen or a Great Lakes aquatic regimen... within the boundaries of a unit of the National Park System, except for resources owned by a non-federal entity." 16 U.S.C. § 19jj(d).

and affirmatively mention or textually preclude application of the Limitation Act. Similar in purpose to the PSRPA, both the Oil Pollution Act of 1990 (OPA 90), 33 U.S.C. § 2719, and the Marine Protection Research and Sanctuaries Act (MPRSA), 16 U.S.C. § 1443, provide the United States a means for monetary redress when a protected natural resource is destroyed or harmed due to some human act. However, unlike the PSRPA, both OPA 90 and the MPRSA textually preclude application of the Limitation Act, allowing for an assessment of liability based solely upon damages and without regard to the value of the vessel (and its freight) that caused the harm. See 33 U.S.C. § 2718 (OPA 90); 16 U.S.C. § 1443(a)(4)(MPRSA).

The vessel owners place great significance upon Congress's silence regarding the Limitation Act's applicability to the PSRPA. They argue that, viewed in comparison to OPA 90 and the MPRSA, both of which express clear congressional intent to preclude the Limitation Act's application, Congress's silence in the PSRPA with respect to the Limitation Act evidences an intent to limit any award under the PSRPA to the post-accident value of the vessel and its freight, in accord with the Limitation Act.

However, as the United States argues, Congress's silence is susceptible to other interpretations. As stated in *Rogers v. Frito–Lay, Inc.*, 611 F.2d 1074, 1085 (5th Cir.1980), "[s]ilence may indicate that the question never occurred to Congress at all, or it may reflect mere oversight in failing to deal with a matter intended to be covered, or it may demonstrate deliberate obscurity to avoid controversy that might

defeat the passage of legislation...." Significantly, Congress's silence in the context of resource preservation has not resulted generally in deference to the objectives of the Limitation Act.

In 1899, Congress enacted the Rivers and Harbors Act (RHA) to allow for compensation to the United States for damages to government maritime works. 33 U.S.C. § 401, *et seq.* Collective portions of the RHA known as the "Wreck Act" (specifically, Sections 15, 16, 19, and 20; 33 U.S.C. §§ 409, 411, 412, 414, and 415) provide for the removal of obstructions, including sunken vessels, from the United States' navigable waterways. The text of the RHA is silent concerning application of the Limitation Act.

In *University of Texas Medical Branch at Galveston*, 557 F.2d 438 (5th Cir.1977), the court addressed whether the potential liability of a negligent party for the cost of wreck removal under the Wreck Act of the RHA is subject to the Limitation Act. Finding that the policies of the later-enacted RHA were incongruous with those of the Limitation Act, the Fifth Circuit held that damages awarded under the Wreck Act were not subject to limitation:

> To accord full effect to the Limitation Act by limiting the United States to an *in rem* recovery is merely to pour an old wine into a new bottle.... This is not to say that the Limitation Act no longer has any vitality. It is rather to say that its force succumbs to that of a later statutory enactment which, when still later construed by the Supreme Court in a manner that wars with the policies of the Limitation Act, must prevail over the earlier Act.[11]

11. The Fifth Circuit refers to *Wyandotte Transportation Co. v. United States*, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967), which holds that under Section 15 of the RHA, 33 U.S.C. § 409, the United States may recover the costs of removing a vessel negligently sunk in navigable waters from those responsible for the sinking. While *Wyandotte* expressly reserves judgment on the specific question whether the Limitation Act extends to the RHA, numerous courts have relied upon the Supreme Court's language in *Wyan-*

*dotte* to find the Limitation Act inapplicable to later-enacted, remedial statutes that appear to conflict with the purpose of the Limitation Act. *See, e.g., University of Texas Medical Branch at Galveston*, 557 F.2d 438, 447 ("... Wyandotte appears to stand for the proposition that the United States must be afforded complete relief against the parties responsible for the sinking."); *Hines*, 551 F.2d at 725 ("While... we recognize that the Supreme Court in the Wyandotte case specifically reserved judgment on the precise question

*University of Texas Medical Branch at Galveston,* 557 F.2d at 455; *see accord Hines, Inc. v. United States,* 551 F.2d 717 (6th Cir.1977).

As a second example of the courts' reluctance to extend the Limitation Act despite the absence of a specific statutory exception to the Limitation Act, the United States cites *In re Glacier Bay,* 944 F.2d 577 (9th Cir.1991), which addresses the application of the Limitation Act to the later-enacted Trans–Alaska Pipeline Authorization Act (TAPAA) of 1973, 43 U.S.C. §§ 1651–1655.[12] *Glacier Bay* affirms the district court's ruling that in enacting the TAPAA Congress implicitly repealed the Limitation Act with regard to vessels transporting trans-Alaska pipeline oil.

> Simply stated, the Limitation Act is contrary to every goal of the TAPAA. It allows vessel owners virtually to eliminate liability for catastrophic damages. Application of the Limitation Act to any aspect of TAPAA would frustrate completely TAPAA's comprehensive remedial nature.

*Glacier Bay,* 944 F.2d at 583.

In declining to extend application of the Limitation Act, both the Fifth and the Ninth Circuits acknowledge a sharp conflict between the Limitation Act and more recent remedial statutes. However, in this case, the vessel owners argue that the PSRPA and the Limitation Act do not conflict and, therefore, that the holdings of *University of Texas Medical Branch at Galveston* and *Glacier Bay* are inapplicable.[13] Upon reviewing both statutes, the Court finds the PSRPA and the Limitation Act in direct conflict in at least one significant respect and, accordingly, holds that the PSRPA, the later-enacted statute, supersedes the Limitation Act as to claims arising under the PSRPA. *See Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 154, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976) ("[W]here provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one...." (citations omitted)).

Most obviously, the Limitation Act limits the recovery of damages to the post-accident value of the vessel and pending freight. The PSRPA imposes no limit on damages. The vessel owners' suggestion that the Court read a damage limitation into the PSRPA appears to impair a central purpose for which the statute was enacted: to provide the United States a means, other than the general funds of the United States, by which to restore and replace damaged park system resources. As in the instance of the TAPAA, discussed in *Glacier Bay,* application of the

---

which our instant case requires us to decide, we believe the Wyandotte decision nonetheless points toward the no limitation result outlined above.").

**12.** The TAPAA establishes a comprehensive liability scheme applicable to damages resulting from the transportation of Trans–Alaska pipeline oil. The Act holds the shipowner and the Trans–Alaska Pipeline Fund (created by the TAPAA) strictly liable for the first $100,000,000 of liability. If the total claims exceed $100,000,000, the claimants may pursue the unpaid portions under other applicable state and federal laws. 43 U.S.C. § 1653(c)(3).

**13.** The vessel owners rely in part on § 19jj–1(d) for their argument that the PSRPA and the Limitation Act do not conflict and, therefore, that the provisions of the Limitation Act are applicable to suits brought pursuant to the PSRPA. Section 19jj–1(d) of the PSRPA, entitled "Scope," states:

> The provisions of this section shall be in addition to any other *liability* which may arise under Federal or State law.

16 U.S.C. § 19jj–1(d) (emphasis provided). The vessel owners contend that "because the U.S. is not restricted from using all available remedial statutes against those damaging park property, the defendants should be given equal protection of the law by being able to raise all available defenses" (Doc. 18, p. 10).

A plain reading of § 19jj–1(d) indicates Congress's intent not to limit the United States' means for redress with respect to damaged resources of national parks. The vessel owners' attempt to utilize this language in support of their argument that the Court should imply an additional defense or recognize a damage limitation with respect to the PSRPA is not persuasive.

Limitation Act to the PSRPA would "frustrate completely" the statute's comprehensive remedial nature. *Glacier Bay,* 944 F.2d at 583.

In addition to the difference in the prospective monetary recovery contemplated by the respective statutes, the statutes direct themselves toward distinct aspects of an episode that results in damage to a park resource: one statute looks to the issue of knowledge and the other looks to the issue of cause. The Limitation Act grants a limitation on damages, which is deserved presumably because of the vessel owner's lack of knowledge of any pertinent negligence or unseaworthiness. *See, e.g., In re Hercules Carriers, Inc. v. Claimant State of Florida,* 768 F.2d 1558 (11th Cir. 1985). The PSRPA directs attention only to the issue of causation—the historical mechanism that in fact brought about the damage—and visits on the party who actually causes the injury the entire measure of damages without regard to any exculpation based on lack of knowledge.[14]

However, under either statute, the entire value of a vessel and its freight are subject to the claims arising from the injury; the vessel and the freight are subject to confiscation either way. Over and above the value of the vessel and the freight, the PSRPA visits upon any "person" who causes injury to a park resource the entire cost of both response and restoration. Stated differently, the liability established under the *in personam* provisions of the PSRPA is "in addition to" the liability attendant after application of the Limitation Act (and after application of the *in rem* provisions of the PSRPA). Therefore, the statute fittingly specifies in its definition of the statute's "scope" that "[t]he provisions of this section shall be in addition to any other liability which may arise under Federal or State law." Logic precludes interpreting a statute that claims to establish liability "in addition to" the liability established by other pertinent

law as if the statute establishes liability only "subject to" other pertinent law.

Finally, and as a general matter, the Court is inclined to apply the more recent, more specific, more focused expression of statutory intent. The disparate conditions that led to the original passage of the Limitation Act no longer threaten with the same force. *See University of Texas Medical Branch at Galveston,* 557 F.2d at 454 n. 25 (citing Justice Black's dissenting opinion in *Maryland Casualty Co. v. Cushing,* 347 U.S. 409, 437, 74 S.Ct. 608, 98 L.Ed. 806 (1954), where he, speaking for four members of the Court, observed, "[j]udicial expansion of the Limited Liability Act at this date seems especially inappropriate. Many of the conditions in the shipping industry which induced the 1851 Congress to pass the Act no longer prevail."); *Hercules Carriers,* 768 F.2d at 1565 (characterizing the Limitation Act as "hopelessly anachronistic"). As stated in *University of Texas at Galveston,*

> Congress passed the Limitation Act in an era before the corporation, with its limited shareholder liability, had become the standard form of business organization and before the present range of insurance protection was available. There is a serious question whether the Act retains vitality within the sphere in which it has traditionally applied....

557 F.2d at 454. *See accord, Continental Oil Co. v. Bonanza Corp.,* 677 F.2d 455, 466 (5th Cir.1982). Although the continued vitality of the Limitation Act is unquestioned in general maritime matters, in the event of a statutory collision, the Limitation Act must yield to a more current, more focused, and more urgent congressional imperative, especially when the manifest intent of the statute is to provide a comprehensive remedy in a matter of great public interest.

---

**14.** Modeled after the MPRSA (which the Eleventh Circuit in *United States v. M/V Jacquelyn L,* 100 F.3d 1520, 1521 (1996) interpreted as a strict liability statute), the PSRPA contains substantially similar liability and damage provisions. Compare 16 U.S.C. § 1443(a) and § 1432(6) with 16 U.S.C. § 19jj–1 and § 19jj.

## CONCLUSION

The intersection of the Limitation Act and the PSRPA presents a formidable question of statutory interpretation and congressional intent. Neither the parties nor the Court has discovered binding precedent. The vessel owners emphasize the historical and essential objectives of the Limitation Act and their importance to the maritime industry in arguing for the Limitation Act's supremacy. The United States, in arguing for vindication of the objectives of the PSRPA, adverts to the recent legislative affirmation of the imperatives of preserving a scarce and singularly treasured national possession.

■ An interesting conundrum arises from the parties' arguments concerning the two statutes. Generally, a more specific statute governs over a more general statute. That familiar maxim of statutory construction leaves the occasionally troubling question of which statute is more specific. Viewed from the standpoint of the damaged property, the PSRPA is more specific than the Limitation Act in the sense that damage caused by a vessel to a park resource is a more specific topic than all other damage prospectively caused by any vessel. On the other hand, damage caused by a vessel is a more specific topic than damage caused by all other mechanisms or all damage caused by all "persons." Frankly, this perspective is susceptible to other and even more confusing expressions which, even if further expounded, do not ring true as the proper mechanism of decision in this case.

■ More accessible is the equally familiar temporal argument: a more recent statute governs over a more remote statute. The United States features the temporal argument and insists that the more recent, more eminent provisions of the PSRPA govern over the putatively old and tattered Limitation Act, about which judges have occasionally written unflattering things. This general sense of a preference for a more recent statute is neither unwavering nor infallible, but it undeniably exists and should be consulted respectfully

in such matters. On the other hand, the vessel owners argue with force that a longstanding, familiar, and valuable limitation or exemption from liability ought not fall victim offhandedly to implicit repeal and that Congress may remove the familiar protection of the Limitation Act only by a specific and prominent (and, no doubt, hotly and noisily contested) statutory declaration. (In fact, this argument partakes of an argument from frustration to the effect that the courts should prevent *sub silentio* repeal of statutory privileges and immunities by the legislative branch because the repeal was effected without a clear and knowing opportunity for public protest and calculated resistance.)

However, Congress occasionally works its will by the expedient of a resolute yet general utterance, to which all conflicting or earlier utterances must yield. No special form of public warning is required, and Congress is not prohibited from the forceful and sudden pronouncement of a change in public policy. More specifically, Congress is not required, at risk of the frustration of a manifest and eminent legislative purpose, to sift laboriously through the accumulated body of public law and specify and patently override by chapter and verse each provision that by operation of the concerted will of Congress may be adversely affected or even abolished.

In this instance, the PSRPA effects a legislative purpose to swiftly and reliably restore damaged marine park resources by assessing the cost of repair and the cost of response directly and fully against the perpetrator. Section 19jj–1 of the PSRPA provides that the PSRPA's statutory remedy exists "in addition to any other liability which may arise under Federal or State law." The most reasonable and comfortable interpretation of this statutory preference for the pronouncements of the PSRPA is alone sufficient to provide textual evidence of a manifest and eminent congressional intent to impose the statute's liability, notwithstanding the provisions of the balance of congressional pronounce-

1308

ments, some of which might prove inconsistent.

Section 19jj–3 of the PSRPA provides for the use of funds recovered by operation of the statute. In this extraordinary allowance, Congress provides that "without further congressional action" the Secretary of the Interior may accumulate and deploy money received pursuant to the act in pursuit of the full and immediate restoration of damaged park resources. This uncommon authority to expend funds of the United States without an annual authorization or appropriation provides persuasive evidence of a manifest and eminent legislative purpose to effect the objectives of the Act by employing the means created in the Act.

■ I regard as unlikely the conclusion that Congress intended the Limitation Act to preponderate over the PSRPA, a focused and directed statute that aims to marshal money for the swift restoration of delicate and vulnerable national resources. That conclusion would require the acceptance of a secondary premise that is also unlikely: that Congress fashioned a statute to restore damaged marine park resources, yet simultaneously planned to exempt from its provisions, by the force of mere statutory silence, the owners of large commercial vessels, which are among the most likely human instrumentalities to damage the resources (and to damage them most acutely) and are among those most able to respond to the injury with sufficient money. Congress, as it has here, typically selects its means more purposefully than that.

For these reasons, the Court **GRANTS** the United States' motion and declines to enjoin the United States from filing against the vessel owners a separate action based on the PSRPA.